## UNITED STATES v. J. I. CASE CO.
### Civ. No. 2834.

United States District Court
D. Minnesota, Fourth Division.
Sept. 26, 1951.

Willis L. Hotchkiss, E. Houston Harsha, Ewart Harris, Francis C. Hoyt, and Harry R. Talan, of the Midwest Office, Anti-trust Division, Department of Justice, all of Chicago, Ill., for United States.

D. C. Edwards and M. Dana Nicholson, of Minneapolis, Minn. (Clark M. Robertson, of Milwaukee, Wis., H. Maxwell Manzer, of Madison, Wis. and Nichols, Mullin & Farnand, of Minneapolis, Minn., of counsel), for defendant.

NORDBYE, Chief Judge.

The J. I. Case Company, referred to herein as Case, is a Wisconsin corporation with its principal office and place of business at Racine, Wisconsin. It is a manufacturer and distributor of farm machinery, with plants located in Wisconsin, Illinois, Iowa, California and Alabama. Its business is nation-wide and it maintains some 23 branches, including one at Minneapolis. It manufactures and sells a complete line of farm machinery and is considered a long-line producer of farm machinery, that is, one which manufactures and sells a relatively complete line of farm machinery. During the period in question herein, the principal types of farm machinery manufactured and sold by Case were plows and listers; harrows, rollers, pulverizers and stalk cutters; planting, seeding, and fertilizing machinery; cultivators and weeders; sprayers and dusters; harvesting machinery; haying machinery; machines for preparing crops for market or for use;

farm elevators and blowers; tractors for farm use; farm wagons, trucks, and other farm transportation equipment.

The farm machinery distributed by Case is sold through a dealership organization. These dealers are independent owners and operators of farm machinery businesses in various towns and cities throughout the Nation. There were some 3,738 Case dealers in 1948. They operate under a yearly contract which usually expires on October 31st of each year. The yearly contract with dealers appears to be the universal custom in the farm machinery industry, with the exception of International Harvester Company, which uses a continuous contract subject to cancellation by either party on sixty days' notice.

Plaintiff charges that, beginning some time prior to 1944 and continuing to September 9, 1948, the date the complaint was filed herein, Case, in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act, 15 U.S.C.A. §§ 1, 14, "executed, entered into and is operating under written and oral contracts with a substantial number of its dealers which require said dealers to confine their purchase and sale of farm machinery exclusively to the farm machinery manufactured and sold by Case and to refrain from the purchase and sale of competing farm machinery manufactured and sold by others than Case, which said oral and written contracts are in unreasonable restraint of, and substantially lessen competition, in the herein described interstate trade and commerce in farm machinery." The applicable provisions of the statutes involved are as follows:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * *." Section 1 of the Sherman Act, 15 U.S.C.A. § 1.

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States * * * or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." Section 3 of the Clayton Act, 15 U.S.C.A. § 14.

It was not contended at the trial that the dealers' contracts contain any written restrictions as to the handling of competitive farm machinery, but it is claimed that the sales are made to a substantial number of Case dealers on the oral understanding and condition that the dealers are to be exclusive Case dealers and that Case refuses to enter into written dealership contracts and refuses to renew existing written dealership agreements unless the dealer agrees to become an exclusive Case dealer. It is plaintiff's position that Case, by pressure tactics, has coerced a number of dealers to become exclusive, and that such tactics and its general policy of preferring exclusive dealers, together with the hold over dealers by reason of the one-year contract, have resulted in a large and increasing number of dealers which are exclusive Case dealers. Plaintiff points out that in 1948 the sales of Case were the third largest of the long-line companies in the Nation, and that during that year the amount of sales of the long-line companies and the percentage of such sales to the total sales of farm machinery in the United States was as follows: [1]

| International Harvester Co. | $351,511,000 | 22.79% |
|---|---|---|
| Deere Co. | 235,339,000 | 15.26% |
| Case Co. | 107,941,000 | 7 % |

---

1. Defendant's Exhibit 132–A, however, includes Dearborn Motor Corporation, successor to Ford Ferguson Co. as a farm machinery manufacturer, and in 1948 its sales exceeded Case's. In that year, Dearborn Motor Corporation's sales were 10.15% of the total sales in the industry and Case's were 7%.

| Allis-Chalmers | 104,423,000 | 6.77% |
| Oliver Corporation | 64,446,000 | 4.18% |
| Minneapolis-Moline | 55,741,000 | 3.63% |
| Massey-Harris | 58,645,000 | 3.80% |

It appears that the total industry's domestic sales of all farm machinery were $1,541,896,787 for 1948, while the total sales of the long-line companies for that year were $978,047,731. As evidence that Case improved its competitive position between 1944 and 1948, the following table is cited as showing the amount of domestic sales of farm machinery by Case, together with its percentage of the total sales in the industry each year:

| 1944 | 1945 | 1946 | 1947 | 1948 |
| --- | --- | --- | --- | --- |
| $36,468,000 | $41,465,000 | $28,911,000 | $60,151,000 | $107,941,000 |
| 3.68% | 4.36% | 3.75% | 5.25% | 7% |

Moreover, it also is pointed out that the number of Case dealers has grown from 2,781 in 1944, of whom 784 or 28.19% carried only the Case line and no other lines (either long or short), to 3,738 in 1948, of whom 1,050 or 28.9% were strictly Case dealers carrying no other line of farm machinery. Plaintiff emphasizes the fact that, of the competitive lines handled by Case dealers, the short lines exceed substantially the long lines.

The acts of alleged coercion and pressure to bring about exclusivity in Case sales, upon which the plaintiff relies, are to be found in the dealings between Case representatives in the field, principally the territory supervisors and branch managers, and the dealers. The territory supervisors call upon the dealers frequently to observe the progress in their business methods, their facilities for service and the type of their establishments, and no doubt to aid them in putting into operation sound business policies so that they may be successful dealers for Case. When the contract with the dealer is to be renewed, it is generally the territory supervisor who recommends to the branch manager whether the contract should be renewed or whether Case should look for another dealer. The obtaining of new dealers to replace those whose contracts have not been renewed is generally a matter allotted to the territory supervisors, subject to the approval of the branch manager of that particular district. In addition to the alleged general policy of Case to obtain exclusive dealers, as reflected in correspondence and bulletins issued by the executives of the company and branch managers, plaintiff's testimony is directed primarily to instances involving some 108 dealers located in 13 of the 23 branches maintained by the defendant and as to which it is contended that there were certain acts and conduct of the territory supervisors and the branch managers which indicate coercion and pressure, all designed to obtain exclusivity in Case dealerships and in pursuance of the general policy allegedly adopted by Case. In this regard, plaintiff's evidence includes testimony from dealers and former dealers, but it also is documentary, such as letters, bulletins, and a number of dealer analysis reports. Generally, one such report is made out as to each dealer each contract year by the territory supervisors. Before trial, the Government examined in the files of defendant some 13,000 dealer analysis reports for the four-year period from 1944 to 1947, inclusive, and from these 13,000 reports it has selected 78 reports which allegedly contain comments of the territory supervisors evidencing Case's coercive policies, all directed to obtaining exclusivity among its dealers. Not only did the Government have access to some 13,000 dealer analysis reports from the defendant's files, but through questionnaires it interrogated some 4,854 dealers and former dealers of Case as to the latter's activities in imposing competitive restrictions. It received some 3,676 replies and it has selected from the investigation thus made the 108 dealers referred to as to whom alleged coercive and pressure tactics were performed as evidence of violation of the Sherman and Clayton Acts.

And from the oral and documentary evidence introduced at the trial which pertains to the 108 dealers, plaintiff has made a list of the dealers of that group whose con-

860

tracts Case has allegedly refused to renew, or threatened to refuse to renew, because the dealers would not refrain from dealing in farm machinery manufactured and sold by competitors of Case. Also, there has been prepared a list of dealers from that group with whom Case has allegedly contracted to sell farm machinery manufactured by it upon the condition, agreement, or understanding that the dealers would not deal in farm machinery manufactured and sold by competitors of Case. It is urged by plaintiff that Case, by its coercive tactics as to these 108 dealers, has caused them to drop various lines of competing farm machinery, and therefore has closed to that extent the farm machinery market to its competitors. And a list has been submitted which indicates that the long-line competitors allegedly dropped by Case dealers are as follows: Allis-Chalmers in 25 instances; Minneapolis-Moline in 21; Oliver in 13; Deere in 7; Massey-Harris in 11; International Harvester in 4. One short-line manufacturer, New Idea Company, was allegedly dropped in 27 instances. Plaintiff also points out that in 1944 Case sold to these 108 dealers $1,218,314 of farm implements; in 1945, $1,207,275; in 1946, $416,754; and in 1947, $657,622. The drop in sales in 1946 and 1947 is explained in part, according to plaintiff, by the elimination of dealers who handled competing lines. A prolonged strike in the Case plant, however, in 1946 materially affected its output.

It is these 108 instances which the Government urges as acts which justify the inference that they typify the relation existing between Case and its entire dealer organization. Summarizing, therefore, it may be stated that plaintiff contends that the Case Company, through its enunciated policies and the acts and conduct of its representatives, its general policy directed toward achieving exclusivity in its dealer relations, and by its power over its dealers arising from its custom of entering into one-year contracts, has eliminated a substantial number of its 3,700 dealers as outlets for the distribution of competitive lines and that its restrictive dealer policies upon its nation-wide dealer organization is bound to have a significant impact upon the farm machinery market. And plaintiff contends that a substantial segment of interstate commerce in farm machinery has been restrained by Case's tactics in violation of Section 1 of the Sherman Act; that the acts tend to create a monopoly; and that competition has been lessened substantially in violation of Section 3 of the Clayton Act.

At the outset, it should be made clear that there is an absence of any evidence from any long or short-line farm machinery manufacturer that its outlets have been restricted by Case's policy with its dealers, and further, there is no evidence that available outlets to the farmers for the purchase of farm machinery have been narrowed in any way thereby. On the contrary, the evidence discloses that there are farm machinery dealers representing nearly every full-line manufacturer and many short-line manufacturers in most towns in agricultural areas within a reasonable shopping radius of the farmer. Rather, plaintiff emphasizes the fact that it is the freedom of competing which Case's policies affect; that is, plaintiff contends that each dealer should have the right to buy from every farm machinery manufacturer and distributor who desires to sell, and that there should be no restriction on the right of any farm machinery manufacturer to sell to anyone who may desire to buy. And while there are a substantial number of Case dealers who handle either long or short lines of competing companies, it is alleged that the potential power of Case to eliminate competitors from access to its dealers as outlets for the distribution of competing farm machinery justifies the granting of the relief prayed for herein. Standard Oil Co. of California v. United States, 337 U.S. 293, 311, 69 S.Ct. 1051, 93 L.Ed. 1371.

Reference should be made to some of the factual background disclosed by the evidence with respect to Case's policy as to exclusivity in establishing dealerships, and in order to ascertain whether there is substance to plaintiff's position as to coercion and pressure and Case's alleged potential power to clog competition, a rather detailed analysis of the evidence upon which the Government relies should be made.

It is evident that Case has been intent throughout the years in question on obtaining dealers who will devote the major part of their activities to the Case line where the market in any particular area justifies it, and to have such dealers handle a full line of Case farm implements. Case always has recognized that when a dealer for any reason did not fairly represent it, it should freely exercise its right to obtain a new dealer in that particular community. Moreover, it is reasonably clear from the bulletins and communications emanating from the home office that the handling of two full lines of farm machinery by a dealer was in many, if not in most, instances discouraged. This is evident from a general letter sent out by Case to its branch managers under date of October 15, 1945, in which it states in discussing the subject "Divided Effort", "A good business man cannot handle more than one full line contract, nor effectively serve two masters. Many dealers have tried it. Inevitably one company or the other becomes dissatisfied, and almost without exception the sale of one line is favored and the other gradually dwindles and, consequently, we should definitely discourage a dealer being in 'competition with himself' by attempting to handle two full lines of farm equipment in the highly competitive buyer's market ahead of us."

But the company's policy regarding any attempt on the part of its representatives to coerce or dictate to a dealer as to the other lines he could handle was evidenced from a bulletin circulated as early as the year 1939 and recirculated in 1946 and sent to all managers and branch managers, stating, in part:

"It is the Company's policy to secure in each community the best possible dealers to represent it. A dealer has at all times the privilege of selecting the line of product he desires to sell. On the other hand, we should select dealers who will fairly represent the Company in their community according to the sales opportunities which exist there for our lines. A dealer should be convinced that there is a real opportunity to prosper by devoting himself to the sale of Case products. The dealer should be obtained and continued as a result of salesmanship based upon the merit of our products and profit making opportunities for the dealer. Whenever the dealer fails for any reason to fairly represent the Case line, then it is of course our privilege to endeavor to secure a better representative and we should exercise that privilege in building up and strengthening our dealer organization.

"Occasionally an over-zealous salesman may attempt to use tactics other than well recognized salesmanship principles in attempting to build up a dealer organization. We have had many years of experience as a so-called short line company, and have met with occasional attempts on the part of salesmen of other companies to dissuade —even prevent—dealers from handling the Case line. In the long run this type of activity always proved unsuccessful and clearly demonstrated that the practice is unsound and poor salesmanship.

"We, therefore, repeat:

"a—That it is neither good buisness nor good salesmanship to attempt to dictate or coerce any dealer with respect to lines of goods that he may be handling. It is the dealer's business to handle what he chooses —not our business to attempt to dictate to him in this respect. No permanent and successful dealer relationship can be built up on any such basis.

"b—That there is nothing in this policy which interferes with our selection of dealers or the discontinuance of any dealer, by reason of his failure to fairly represent the Case line in his trade area.

"You are responsible for the carrying out of these as well as other Company policies in your particular branch territory."

Plaintiff contends that the policies thus enunciated are only "paper instructions" and that Case rendered mere lip service to the admonition to its representatives as indicated in this bulletin that they should not attempt to dictate or coerce any dealer with respect to the handling of competitive merchandise. But this contention is not fairly sustained by the evidence. True, the home office executives were inclined to leave the problems of dealership largely

to the branch managers and at times may have accepted their decisions without a thorough investigation when controversies arose as to competitive lines being carried by the dealers. But that the executives of the company adhered to and fairly endeavored to sustain the policies enunciated in the bulletin referred to seems reasonably clear.

During the last World War, there was a shortage of available farm machinery for all dealers. Many dealers were encouraged by Case to take on side lines and competitive lines in order to enable them to make a living. It was apparent that there would not be enough farm machinery available to enable a dealer to stay in business. The supply of farm machinery was allocated for a period under government authority according to counties, and many dealers in farm machinery handling competing lines were induced by Case to take on its line temporarily so that the allotment to Case would have an outlet in that particular county. Hardware merchants, automobile dealers, feed merchants, service stations, truck line operators, and many other types of businessmen were engaged as Case dealers by reason of the very necessities of the situation. And when the war ended and it became evident that there would be farm machinery available again in adequate quantities, there was strenuous competition among the full-line farm machinery manufacturers for business. The situation which pertained to many dealers was unsatisfactory, not only for the dealer but also for the manufacturer, and it is fair to say that, in many instances, both of them recognized the advisability of the dealer's determining which line he would prefer to represent. And it became apparent to Case that, as to many of its dealers, the Case merchandise was carried as a mere side line, with no adequate facilities for service or display, and without sufficient sales personnel. Case realized that it would have to make a survey of all of its dealers, and where inadequate representation was had, new dealers would have to be obtained. And where a dealer was handling another full line with Case and could not do justice to both lines, he was given in many instances a choice as to which line he preferred to handle, and if the competing line was chosen, Case looked for another dealer. No doubt there were many instances where the dealer preferred Case and dropped the other line. Generally, the result in either situation would be that there became a Case dealer and the competitive dealer in the community. Therefore, not only did competition continue, but the free flow of farm machinery rather than being impeded was usually increased. There is no showing that any farm machinery manufacturer had difficulty in obtaining dealers as outlets for its particular line under such circumstances. There was a suggestion at the institution of this litigation that the New Idea Company, a short-line manufacturer, had complained to the Federal Trade Commission that it was having difficulty in obtaining outlets for its machinery with the full-line farm machinery dealers. But no evidence was offered to that effect at the trial herein, and it is not without significance as indicating a free flow of the New Idea line from the manufacturer to the user that the New Idea Company increased its sales from $5,750,000 in 1944 to $21,576,000 in the year 1948, an increase of about 300%.

Strategic locations are not essential for the dealers in the distribution of farm machinery. They may be located on a side street, or even on the outskirts of a town or city and prove to be entirely suitable for the sale and service of farm machinery. And it should be emphasized that most enterprising dealers recognize that they have not the facilities, the capital, or the personnel to handle more than one full line of farm machinery. The advent of power-drawn machinery on the farms and the mechanization of farm machinery throughout the Nation has entirely changed the farm machinery business. Now the farm tractor requires the attention of skilled mechanics substantially to the same extent as the automobile. A full supply of parts for the machinery handled is required to be kept by the dealer. Service men who can promptly respond to the farmer's call when machines break down in the field are indispensable to a successful dealer, and a

progressive dealer in farm machinery generally recognizes that, if he is identified in a community as the representative of one of the major lines of farm machinery, he assumes a certain standing and reputation in the community as a dealer with adequate parts and personnel for servicing the particular line which he handles. Just as an automobile owner prefers to go to the agency for service which handles his car for sale and specializes in that car for service, the tractor owner naturally prefers to go to the farm machinery dealer who sells and specializes in that particular line.

■ It cannot be gainsaid that, in pursuance of a bona fide business policy, Case has the right to select its own customers in absence of any scheme or purpose to effect a monopoly. The Clayton Act itself recognizes this right when it provides, 15 U.S.C.A. § 13, " * * * That nothing contained in sections 12, 13, 14–21, and 22–27 of this title shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade * * *."

And, as stated in United States v. Colgate Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992, "The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal".

■ A farm machinery manufacturer must have independent discretion as to any person or concern which it will designate as a dealer. If a dealer is handling competitive lines to the detriment of Case, for instance, sound business permits it to withdraw and look for another dealer. The suggestion was made in argument by plaintiff's counsel that a dealer has the inherent right to handle as many lines as he desires regardless of the consequences to him business-wise. Granted, but he has no right to require the manufacturer to fail with him. Surely, where a dealer is so wedded to a competitive line that Case is a mere stepchild in the dealer's family, there can be no restriction upon the right of Case to look for another business home in the community. But, with these observations, it must also be emphasized that Case cannot, by direct or indirect methods of coercion or pressure or business policy, obtain any understanding or condition in granting a dealer's contract that the latter will refrain from handling competitive lines if competition may be lessened substantially, or if its acts and conduct in this regard tend to create a monopoly in the farm machinery business.

This brings me to a consideration of the instances with reference to the 108 dealers, upon which plaintiff relies primarily in support of its bill herein. Inferences' are sought to be drawn from comments by the territory supervisors in the dealer analysis reports as indication of Case's policies in obtaining exclusive dealers for its line. Obviously, Case in many instances has preferred dealers who would devote the major part of their time and capital to the selling of Case merchandise. The branch managers were importuned by the management to sell the dealer on the Case line and on the Case franchise, and no doubt efforts in salesmanship were used to convince the prospective dealer that his future was more promising if he would devote his efforts to the Case line rather than being occupied principally with other activities, whether they be diversions in selling hardware, automobiles, or competing farm machinery. But such a policy, in absence of coercion and pressure, merely reflects sound business judgment and reasonable competitive efforts which do not necessarily constitute competitive restrictions.

Many of the comments found in the dealer analysis reports which are relied upon by plaintiff in presenting its claims as to Case's policy have not the slightest probative value as indications of any competitive restrictions enjoined on the dealers referred to.

A large number of these reports and comments therein simply recite that the dealer is handling too many lines, or that it is a split account, or that the dealer is generally non-progressive, and therefore the dealer's contract should not be renewed. There are others wherein it is recited that the dealer intends to drop a competitive line, or that he intends or has agreed to become exclusive when farm machinery becomes more plentiful. There are some comments which on their face appear to indicate an attempt on the part of the territory supervisor to obtain an agreement from the dealer that he will not handle competitive lines. But a fair and impartial analysis of all the dealer analysis reports and the testimony bearing thereon indicate that, in many instances where an over-zealous territory supervisor assumed to indicate an intention or agreement that the dealer would drop competitive lines, the evidence discloses that there was no real foundation for any such suggested agreement, and on the contrary the evidence in some instances affirmatively establishes that the dealer is now handling the competitive lines referred to in the report without any objection on the part of Case. However, it cannot be gainsaid that there are instances disclosed by oral evidence and the dealer analysis reports where certain territory supervisors have had either a prejudice against all dual dealerships, or have assumed that it was good business to attempt to obtain an agreement from a dealer not to handle any competitive lines, and there are likewise sporadic instances where the territory supervisor, with the approval of the branch manager, has given the dealer to understand that his contract would not be renewed unless he gave up a certain designated competitive line. But the instances of apparent competitive restraint pertain to a relatively small number of dealers.

The problem which confronted Case after the war with a more or less hybrid group of dealers handling so many side lines, including competitive lines, may well have occasioned some supervisors and branch managers to over-step the bounds of bona fide salesmanship in selling the Case merchandise. However, after a careful consideration of the 108 dealer instances and an analysis of all the evidence bearing thereon, oral and written, it appears that, as to the bulk of them, they do not sustain plaintiff's inference of an understanding or agreement that the Case contracts were granted upon the condition that no competitive goods would be handled, or plaintiff's contention that the contract was not renewed in furtherance of pressure tactics to require a dealer to give up competing lines. The comments in many of the dealer analysis reports introduced appear to be not only inaccurate, but in some instances wholly unfounded and bear no factual relation to the actual situation which prompted cancellation of the dealer's contract. And statements therein to the effect that the dealer has stated to the supervisor that he expects to handle Case exclusively the following year, or that the supervisor plans to replace the dealer with an exclusive Case dealer, or that the supervisor expects that the dealer will eliminate competing lines as soon as farm machinery becomes more plentiful, do not necessarily imply that an agreement was made by that dealer with the Case representative that he would not handle competing lines. And in light of the entire evidence, it appears affirmatively that, as to many of the dealers referred to in such reports, they were not subjected to pressure tactics and no competitive restrictions were imposed. The contracts as to a substantial number of such dealers were not renewed due to the non-progressiveness of the dealer, rather than in the furtherance of any policy of competitive restraint. And as to many of the competitive lines dropped by the Case dealers, the evidence discloses that it was the full-line competitor of Case which refused to continue its contract with the Case dealer and that is the reason why the competitive line was dropped. Moreover, to lift out isolated portions of the comments in the reports, without regard to all of the evidence which might bear thereon, tends to distort the real import of the language used and the true situation which existed.

The untenability of plaintiff's position is that, while it has established some flagrant attempts to coerce and put pressure on a few

dealers to give up competing lines as a condition for obtaining a Case contract or to obtain a renewal of the Case contract, it seeks to deduce from such instances that every exclusive Case dealer constitutes evidence of a so-called pattern or policy on the part of Case to obtain an agreement or understanding from its dealers that they will not handle competitive lines. The retail farm machinery business cannot be compared with the operation of a grocery or general merchandise store. The reputation and standing of a farm machinery manufacturer and its success in any community are determined in no small degree by the type of dealers it obtains. There would be no purpose for Case, for instance, to obtain initially a dealer in a town or community who already handles a full line of farm machinery, and in seeking to obtain its share of the business in any community, Case naturally and normally seeks a dealer who is sold, so to speak, and enthusiastic about its line. To obtain dealers who are wedded to other full lines of farm machinery would indicate, of course, an utter lack of ordinary business acumen and prudence. Therefore, when plaintiff points out that in 1948 there were 3,738 Case dealers, of whom 1,050 were strictly Case dealers who handled neither competing long nor short lines, and contends that this fact is evidence of Case's potential power to restrict competition, it must be remembered that many dealers of their own volition handle only the Case full line, without any competitive lines, that others prefer the Case full line with certain short lines, and that in the normal course of establishing dealerships, Case seeks to obtain one who is free to devote the major part of his effort to the franchise offered to him. As a reason why so many dealers do not prefer or cannot expand their activities so as to include other full lines, reference may be made to the testimony of Mr. Paul M. Mulliken, Manager of the National Retail Farm Equipment Dealers Association, which is an affiliation of 34 state and regional associations of some seventeen thousand farm equipment dealers. He stated that the number of dealers in the farm machinery industry who handle more than one major line are comparatively few, and as a reason therefor he indicated that a farm machinery dealer should have an investment of at least $50,000, excluding real estate, in order to be a successful operator. Obviously, the handling of more than one full line requires additional inventory, not only in regular merchandise, but in parts as well.

Not only does the testimony regarding the 108 dealers fail to sustain the inferences which plaintiff seeks to draw, but it seems significant that, of the 108 instances, only 26 occurred after January 15, 1946, when normal conditions after the war began to be resumed in the farm machinery industry. Plaintiff's evidence discloses that there were 16 instances in the year 1946, 10 in 1947, and none in 1948. Moreover, there were only seven dealers out of the 3,738 Case dealers in the United States who were called to testify that any attempt had been made to convince them that they should drop competing lines during the years 1946 and 1947. And of these 3,738 dealers, some 2,600 were handling competing lines, either long or short. And in this connection, it should be remembered that the Government circulated all of these dealers by questionnaires as to Case's competitive restriction policy during the years in question. These circumstances tend to negative plaintiff's contention that Case is pursuing a pattern or policy of imposing competitive restrictions on its dealers.

Section 3 of the Clayton Act is directed to the preserving of a free flow of goods to the ultimate market—here, the users of farm machinery. If there are agreements or understandings or conditions made with dealers that they shall not handle competitive lines, such arrangements may prevent these dealers from handling that particular line or lines, and thus prevent the free flow of farm machinery through the necessary outlets to the farmer. Under such circumstances, competition may be lessened or there may be a tendency to create a monopoly. The potential power thus obtained to lessen competition would be sufficient if, were it to become actual, "it would impede a substantial amount of competitive activity." Standard Oil Co. v. United States,

supra, 337 U.S. at page 314, 69 S.Ct. at page 1062. But, here there is an absence of any sufficient showing that a substantial amount of competition in the farm machinery industry has been lessened thereby, either actually or potentially. Here, there is no "potential clog on competition", which the Supreme Court referred to in the Standard Oil case, and upon which decision the Government primarily relies. The difference between the facts of that case and the instant case is obvious and controlling. In the Standard Oil case, the competitive restrictions were incorporated in the franchise contract and were admitted. Here, we have no direct evidence of any agreement or condition of competitive restrictions except as it may be gleaned from the so-called acts and conduct of the Case Company's executives and its employees. Here, there is an abundance of evidence that the exclusivity of Case dealers is a matter of the dealer's volition in most instances, or recognition by both the dealer and the manufacturer that good business practices suggest such an arrangement. Moreover, here we have a large number of instances upon which the Government relies which merely reflect Case's attempt to select its own dealers without any intent or purpose to suppress competition or to obtain a monopoly, and which represent its bona fide selection of dealers in pursuance of a sound business policy. That Case's conduct in this regard was motivated primarily by a desire to select dealers who will satisfactorily represent it, rather than by any plan or scheme to achieve a monopoly or to restrict competition, seems evident because in many instances the evidence discloses that there never has been an attempt to disturb or change a dealer who carries a competitive long or short line where it appears that such dealer has the finances, the ability, and the facilities for so doing. The refusal to renew a contract with farm machinery dealers because they are devoting too much time to a competitive line cannot be compared with the situation which results from the contracts which existed in the Standard Oil case where some 5,937 dealers, being 16% of the retail filling station outlets in the seven states involved, as a condition of handling Standard products, covenanted not to handle goods of any competitor and thereby conclusively disabled themselves as outlets for the free flow of competitive goods in commerce during the franchise period.

Realistically considered, it is difficult to understand from the evidence how Case's acts and conduct would have any tendency to lessen competition substantially, or that the outlet for farm machinery has been, or would be, narrowed or endangered thereby. There are some 20,000 farm equipment dealers in the United States and of these dealers the Government relies upon evidence which pertains to 108—less than ½ of one per cent of the entire number of farm equipment dealers. Moreover, generally when a Case contract was not renewed as to any one of its dealers, the merchandise of both Case and the competitor continued to flow in commerce as before—the competitor's through the former Case dealer, and Case's through another dealer established by it. And the plaintiff's reference to dealers' competitive lines sold, or once sold, by the 108 Case dealers as incidents which disclose the closing down of farm machinery outlets of such competitors, together with the amount of yearly sales to these Case dealers from 1944 to 1947, inclusive, lacks any real probative persuasiveness, in that the evidence does not support plaintiff's contention of anything more than isolated instances of temporarily restricting an unsubstantial number of competitive outlets. In fact, as to a number of the 108 dealers, there is no competent evidence that they ever dropped any competitive line while Case dealers, and if they did, the record indicates that reasons other than competitive restrictions imposed by Case were responsible. Not only is there failure in the evidence to establish any substantial restrictions on outlets for the retail distribution of farm machinery, but the evidence reflects that there is healthy competition among all farm machinery manufacturers. The existence of a vigorous growth in the farm machinery business reflecting sound competition seems evident from the follow-

ing table which lists the full line competi- of each between 1944 and 1948 and each
tors of Case and the annual domestic sales company's percentage of the total sales:

| | 1944 | 1945 | 1946 | 1947 | 1948 |
|---|---|---|---|---|---|
| International Harvester Co. | $156,532,000 (15.80) | $167,730,000 (17.64) | $171,598,000 (22.25) | $267,757,000 (23.39) | $351,511,000 (22.79) |
| Deere Co. | 95,530,000 (9.64) | 93,686,000 (9.85) | 116,322,000 (15.08) | 161,484,000 (14.10) | 235,339,000 (15.26) |
| Allis-Chalmers | 31,413,000 (3.17) | 41,120,000 (4.32) | 26,709,000 (3.46) | 72,444,000 (6.33) | 104,423,000 (6.77) |
| Oliver Corporation | 20,955,000 (2.12) | 27,325,000 (2.87) | 32,792,000 (4.25) | 44,745,000 (3.90) | 64,446,000 (4.18) |
| Minneapolis-Moline | 16,908,000 (1.71) | 18,265,000 (1.93) | 23,649,000 (3.07) | 38,000,000 (3.33) | 55,741,000 (3.63) |
| Massey-Harris | 10,735,000 (1.08) | 12,490,000 (1.31) | 22,482,000 (2.92) | 32,299,000 (2.82) | 58,645,000 (3.80) |

Objection is made by the Government to the one-year contract which the dealer obtains from Case and the potential power which the company allegedly has by its right to determine whether any contract will be renewed at the end of a contract year. This custom, it is contended, permits the defendant to threaten an established dealer with non-renewal unless he conforms to Case's policy, and therefore it becomes an important factor in imposing competitive restrictions. Granted that this power in the hands of a manufacturer may be abused and utilized for such purposes, there is an absence of any satisfactory evidence that it has been directed to that end. The fact that 71.91% of the 3,738 dealers handled some lines of competitive farm machinery, long or short, in 1948, tends to negative any assumption that coercive tactics or competitive restrictions by threats of cancellation or non-renewal have been used. True, the large majority of the competitive lines handled are short lines, but that is due primarily to recognition by the dealer that he does not have the facilities or capital to handle another full line. Only one dealer who testified complained about the one-year contract, stating that, if not renewed, it might leave the dealer with orphan parts. From the dealer's point of view, a more equitable contract might be devised, but its duration or the recipro-

cal rights of its termination are not for this Court to determine. In any event, the inferences which the Government seeks to obtain from its existence are not persuasive in light of the evidence.

■ Attention is directed by the Government to what it terms "full line forcing." That is, it is contended that Case requires its dealer to handle a full line of Case merchandise as a condition of receiving the Case contract. And it is asserted that this practice tends to exclude the dealer as an outlet for competitive goods. But in this the Government's position is not entirely consistent, in that it contends regarding the alleged competitive restrictions that merely because a dealer handles one full line he is not disabled from handling another full line. In any event, a mutual arrangement between the farm machinery manufacturer and its dealer that it is for the best interest of both for the latter to handle a full line of the manufacturer's output, without any competitive restriction imposed upon the dealer, is not violative of any law. Apparently, most dealers in the farm machinery industry normally prefer to handle the full line of the farm machinery manufacturer which they represent. So far as the evidence indicates herein, the full line dealerships of Case mean nothing more than that the pattern of the industry has been followed by mutual agreements between the

manufacturer and the dealers. The handling by a dealer of a few items of several full-line manufacturers might tend to discourage competition rather than to stimulate it.

 The Iowa State College, through its Statistical Laboratories and Industrial Science Research Institution, made a survey at the behest of the Case Company, dated February, 1951, as to the accessibility of farm machinery in the State of Iowa. Iowa is a typical agricultural State, and it seems fair to assume that the situation there with respect to the marketing of farm machinery is not dissimilar from conditions in the other agricultural states of the Nation. While no attempt was made by the Government to challenge the accuracy or the completeness of the data and information assembled in the survey and no objection was made to the foundation laid for its offer, the admissibility of the document in evidence was objected to as being irrelevant and incompetent. The Court received the exhibit in evidence, subject to further consideration after briefs had been filed. It may be stated that the chief objection to the exhibit was that courts usually do not indulge in, or entertain, economic investigations in determining the pertinent issues in anti-trust litigation. That is true. Moreover, with reference to certain conclusions stated in the survey, it was pointed out that the Court must recognize that it is the potential power for monopoly or suppression of competition which controls and "evidence that competitive activity has not actually declined is inconclusive." United States v. Standard Oil Co., supra, 337 U.S. at page 314, 69 S.Ct. at page 1062. The survey does find that all farm machinery manufacturers have dealer outlets well placed throughout the agricultural areas in the State of Iowa so as to reach the farmer market at all points, and give farmers ready access to all different makes of farm machinery. This finding merely confirms the general picture disclosed by other evidence as to the situation which prevails throughout the country. There are other findings as to the existence of free competition with respect to the retail marketing of farm machinery and lack of monopoly

in the marketing of farm machinery at either the manufacturing or retail level. It is doubtful that such an exhibit has any relevancy or materiality, at least as to some of the issues here, but the Court concludes that there is no need to strike the exhibit. It may remain in evidence for what it may be worth. However, it should be stated that the conclusion hereinafter indicated as to the disposition of this litigation would be the same in absence of this documentary evidence.

 The instances of any coercion and pressure among the 3,738 dealers of defendant, upon which the Government relies, largely abated prior to January 15, 1946. In fact, the number of Case dealers handling competitive lines increased percentage-wise slightly between 1944 and 1948. The instances relied upon by the Government occurred under circumstances which do not sustain its contention that they were carried out in furtherance of any policy of competitive restriction by the company. Rather, they spring up here and there disconnectedly and contrary to the announced policy of the company, and without indicating that there was any pattern of such activities among the company's representatives. Here, no appreciable segment of commerce has been affected or threatened. Here, there is no unreasonable restraint of trade or potential obstruction of competition. The few competitors who may have been foreclosed from dealing with a Case dealer were only temporarily without an outlet for their lines. And such instances are not only relatively few in number, but the amount of commerce actually affected by such restraint is wholly uncertain and speculative. The attempt to spell out any right to injunctive relief to restrain alleged violations of either the Sherman Act or the Clayton Act, on the present showing, is without sufficient persuasive support. The burden of proof rests upon the Government to establish that defendant has engaged in practices, agreements or understandings, and acts unreasonably restraining commerce in violation of Section 1 of the Sherman Act and tending substantially to lessen competition and to create a monopoly in violation of Section 3 of

the Clayton Act. This it has failed to do. The bill, therefore, must be dismissed.

Findings of fact and conclusions of law consistent herewith may be presented upon ten days' notice. An exception is reserved to the plaintiff.