S. Kriete OSBORN

v.

SINCLAIR REFINING COMPANY.
Civ. No. 9769.

United States District Court
D. Maryland.

July 3, 1962.

John S. McDaniel, Jr., Calhoun Bond and Cable & McDaniel, Baltimore, Md., for plaintiff.

Milton Handler, Stanley D. Robinson, Kaye, Scholer, Fierman, Hays & Handler, New York City, and David R. Owen and Semmes, Bowen & Semmes, Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

This case is before the Court on remand by the Fourth Circuit for the determination of all issues relating to damages—whether plaintiff sustained any damages that are properly recoverable, and if so, the amount of such damages. Osborn v. Sinclair Refining Co., 4 Cir., 286 F.2d 832, 840, 841, reversing D.Md., 171 F.Supp. 37. The facts set out in those opinions will not be repeated here, except so far as may be necessary to understand the issues now before the Court.

Defendant (Sinclair) is a refiner and distributor of petroleum products. Plaintiff was a dealer to whom Sinclair had leased a service station in Reisterstown, Md., about ten miles north of the Baltimore City line.

At the original trial of this private antitrust suit plaintiff claimed that his service station lease and dealer's sales agreement were canceled by Sinclair in furtherance of an attempt by Sinclair to monopolize the sale of tires, batteries and accessories (TBA) to its service station dealers in Maryland in violation of section 2 of the Sherman Act, 15 U.S.C.A. § 2, and/or a combination or conspiracy between Sinclair and Goodyear Tire and Rubber Company (Goodyear) to restrain trade in those products, in violation of Section 1 of the Sherman Act, 15 U.S. C.A. § 1. Plaintiff conceded at the original trial that he had not proved a tying arrangement which violated Section 3 of the Clayton Act, 15 U.S.C.A. § 14. This court held that no violation of the antitrust laws had been shown, and entered judgment for the defendant Sinclair. The reasons for the decision were set out in the opinion, 171 F.Supp. at 44 et seq.

The Fourth Circuit did not disturb the findings and conclusions of this Court that plaintiff had failed to prove an attempt to monopolize or to show that the agreements between Sinclair and Goodyear involved an unreasonable restraint of trade. See 286 F.2d at 835. The Fourth Circuit found, however, that an illegal tying arrangement existed between Sinclair and its dealers, unreasonable per se, and prohibited by Section 1 of the Sherman Act, 15 U.S.C.A. § 1, citing particularly Northern Pacific R. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545. See 286 F.2d at 835 et seq.

This Court had found that two factors contributed substantially to Sinclair's decision to cancel plaintiff's lease in May, 1956, namely: (1) the failure of plaintiff's gasoline gallonage to approach the figure which Sinclair thought it should have reached after Sinclair rebuilt and enlarged the station in 1953, and (2) the fact that plaintiff carried so much more Firestone TBA than Goodyear TBA. This Court found that neither of those reasons was predominant, and the Fourth Circuit did not disturb that finding. The Fourth Circuit said:

"Since Sinclair-Sherwood had the right to cancel the lease at its yearly termination date, the problem arises whether the damages flowing from the cancellation are recoverable as damages resulting from the violation of the anti-trust laws. See, however, Emich Motors Corp. v. General Motors Corp., 1951, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534 (1951). Moreover, there is evidence

in the record that Osborn had to pay more for Goodyear TBA products than for other brands which he desired.

· "Of course, if Osborn sustained no damages that are properly recoverable, he has no cause of action. Because of the questions inherent in this phase of the case, we think it appropriate to remand it to the District Court for further hearing, in which the parties will have full opportunity to present additional evidence on the question of damages in the period before as well as after the termination of the lease. The District Court should then determine what items, if any, are recoverable. We wish to emphasize that we are not at this time expressing or intimating any opinion on this aspect of the case." 286 F.2d at 840, 841.

On remand, four questions are presented:

A. What damages, if any, did plaintiff suffer as a result of the illegal tying arrangement in the period before the termination of the lease.

B. Whether the damages flowing from the termination are recoverable as damages resulting from the violation of the antitrust laws.

C. If so, the amount of such damages.

D. The amount of any counsel fees which should be awarded.

The findings of fact made by this Court after the original trial were not disputed by the parties on appeal or on remand, but the parties have filed an additional stipulation of certain facts, plaintiff has offered further testimony, and each side has offered exhibits on the issue of damages. The facts stated below with respect to each point have been found after considering all of the evidence. There is little or no dispute about the historical facts, but much dispute about the inferences to be drawn therefrom and about the rules of law to be applied thereto.

A

The first question is: what damages, if any, did plaintiff suffer as a result of the illegal tying arrangement in the period before the termination of the lease?

Sinclair agrees that under the decision of the Fourth Circuit, plaintiff is entitled to recover the difference between the cost of any Goodyear TBA which he purchased because of the alleged tie-in and the cost of the equivalent amount of Firestone TBA. Because of the statute of limitations, plaintiff has limited his claim under this head to the three years 1954, 1955 and Jan. 1–May 31, 1956. During those years, as during the entire period of his dealership, plaintiff's total purchases of Goodyear TBA were but a small fraction of his total TBA purchases, most of which he made from Firestone. It has been stipulated that if plaintiff had purchased from Firestone all of the TBA which he purchased from Goodyear during 1954, 1955 and 1956, the extra discount would have been $534 ($164 in 1954, $161 in 1955, and $209 in 1956). The evidence also shows that he purchased $4,068 from Goodyear in 1954, $4,983 in 1955 and $4,127 in 1956; and that under the method of proof of this type of damages adopted by plaintiff, there would have been no extra discount from Firestone and therefore no recovery for a particular year unless the additional purchases from Firestone during that year would have been sufficient to carry plaintiff into the next higher discount bracket. The necessary additional purchases from Firestone would have been $2,241 for the year 1954, $2,810 for 1955 and $4,077 for 1956. Stated another way, there would have been no additional discount from Firestone for the year 1954 if plaintiff had purchased as little as $1,823 from Goodyear in that year; the corresponding figures for 1955 and 1956 were $2,173 and $50 respectively.

Plaintiff testified that he purchased some Goodyear TBA because of customer requests for tire sizes not carried by Firestone, and said that he would have purchased at most $500 of Goodyear TBA

during the three years 1954–1956 apart from Sinclair's pressure. On the other hand, Sinclair calls attention to the fact that plaintiff bought $1,961 of Goodyear TBA in 1952, when as he testified, there was solicitation but no pressure, and argues that plaintiff would have willingly bought a similar amount in 1954 and 1955.

On all the evidence I find as a fact that apart from any pressure plaintiff would have bought in each year (including the five month period of 1956), not less than $150 nor more than $1,800 of Goodyear TBA.

■ This finding leads to the conclusion that for the period before the termination of the lease plaintiff has proved $325 damages, which, trebled, amount to $975.

### B

"Whether the damages flowing from the cancellation are recoverable as damages resulting from the violation of the antitrust laws"[1] is a troublesome question, because of the difficulty of reconciling the policy of the antitrust laws with the policy of the general law to preserve the freedom of a private trader acting unilaterally to develop his business and to select his customers as he sees fit. See United States v. Parke, Davis & Co., 362 U.S. 29, 37–38, 44–46, 80 S.Ct. 503, 4 L.Ed.2d 505 discussing the development of the law since United States v. Colgate & Co., 250 U.S. 300, 306–308, 39 S.Ct. 465, 63 L.Ed. 992.

Chief Judge Sobeloff, speaking for the Fourth Circuit in McElhenney Co. v. Western Auto Supply Co., 269 F.2d 332, 337, said: "Generally speaking, the right of customer selection is sanctioned by both statute and case law. Absent conspiracy or monopolization, a seller engaged in a private business may normally refuse to deal with a buyer for any reason or with no reason whatever. Thus, the courts have until now not held a seller liable in damages for refusing to deal with one who is unwilling to enter into an unlawful vertical price agreement or an exclusive dealing arrangement."

■ A manufacturer or distributor cannot claim the benefit of the single trader rule if its refusal to deal is in furtherance of a conspiracy. It is now clear that concerted refusals to deal are illegal per se under sec. 1 of the Sherman Act. Radiant Burners, Inc. v. Peoples Gas Light and Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358; Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741. However, there was no concerted refusal to deal in this case. Sinclair acted alone. Plaintiff argues that there was a conspiracy or combination between Sinclair and the dealers generally. But, although Sinclair may have sought to impose a tying arrangement on each of its dealers, i. e. to require each of them to buy substantial quantities of Goodyear TBA if he desired to continue selling Sinclair gasoline under a lease and sales agreement, there is no evidence that any of the dealers cooperated with Sinclair in this effort. Sinclair did not attempt to have its other dealers bring pressure on the plaintiff, as was done in Parke, Davis & Co. v. United States, supra, and in a number of cases discussed therein.

In F. T. C. v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, Beech-Nut had secured the cooperation of its distributors in keeping supplies from price-cutters. The Court had no difficulty inferring from this cooperation the existence of a prohibited agreement. But in line with Colgate, it directed that the Commission's order, which directed Beech-Nut to cease and desist from refusing to sell to distributors who failed to adhere to the resale prices, be modified to prohibit such refusals to sell only when pursuant to "cooperative methods in which the respondent and its distributors, customers and agents undertake to prevent others from obtaining the company's products at less than the prices designated by it." 257 U.S. at 455–456, 42 S.Ct. at 155.

[1]. 286 F.2d at 840.

Plaintiff also argues that there was a conspiracy between Sinclair and Goodyear. However, the arrangement between Sinclair and Goodyear was quite unlike the combinations or conspiracies resulting in concerted action which have heretofore been held to create liability for refusal to deal. Cf. Radiant Burners and Klor's, supra. Neither this Court nor the Fourth Circuit found any such conspiracy.

■ A manufacturer or distributor also loses his right to refuse to deal if such refusal is in furtherance of a monopoly or an attempt to monopolize. Sinclair did not have a monopoly nor attempt to acquire a monopoly of the market for either gasoline or TBA in Maryland, in Reisterstown, or elsewhere. This Court so found at the original trial, and the finding was not disturbed by the Fourth Circuit.

■ Plaintiff contends that the tying arrangement constituted an attempt to monopolize the market for TBA represented by the Sinclair lessee-dealers, in violation of sec. 2 of the Sherman Act. This contention is not supported by the evidence. The findings of fact set out in the original opinion of this Court, 171 F. Supp. at 38–44, which the Fourth Circuit noted were not contested on appeal, show that although Sinclair's efforts to induce its dealers to carry a substantial quantity of Goodyear TBA if they wished to continue selling Sinclair gasoline, went beyond mere persuasion and salesmanship, in practice most dealers purchased only such TBA as they desired and purchased it from any source they wished. The testimony of plaintiff's own witness showed that most dealers purchased Goodyear TBA because they liked it best, or because of the credit arrangements or other advantages offered them. Very few leases were terminated unilaterally by Sinclair, and those were terminated principally because of the failure of the dealer to sell enough gasoline.[2]

The Fourth Circuit held that there existed between Sinclair and its customers an illegal tying arrangement prohibited by section 1 of the Sherman Act and illegal per se under the Northern Pacific case, but did not hold that it constituted an attempt to monopolize in violation of section 2. The Fourth Circuit further held that there existed "an express agreement with this particular plaintiff to buy Goodyear TBA, made after the cancellation of his first lease, in order for the plaintiff to be restored as a gasoline dealer." 286 F.2d at 839.

For the additional costs which plaintiff sustained as a result of that tying agreement prior to the termination of his dealership and lease, he has been allowed treble damages under A above. But the Fourth Circuit left open the question whether damages arising from the cancelation of the lease and sales agreement are recoverable as damages resulting from the violation of the antitrust laws. 286 F.2d at 840.

If the Fourth Circuit had concluded that the termination had been in furtherance of (a) an attempt to monopolize or a conspiracy to monopolize or other concerted effort or (b) that the termination itself constituted a per se violation or unreasonable restraint of trade, it would not have remanded the case with the instructions set out in the last two paragraphs of the opinion, namely, to determine "whether the damages flowing from the cancellation are recoverable as damages resulting from the violation of the antitrust laws" and "what items, if any, are recoverable." It would have directed the District Court simply to determine the amount of damages to be awarded. On the other hand, if the Fourth Circuit had concluded that the right of Sinclair "to cancel the lease at its yearly termination date" prevented the allowance of any damages for the termination, the last two paragraphs would have been equally inappropriate, because the only damages recoverable would have been those sustained prior to the termination.

The Fourth Circuit must have concluded that absent an attempt to mo-

2. See 171 F.Supp. at 43.

nopolize or such conspiracy or concerted action as existed in Parke, Davis, in a private action for damages based on a refusal to deal, the Court should consider whether the refusal to deal—in this case the termination of the lease and sales agreement—was an unreasonable restraint of trade under all the circumstances. See discussion of the general problem in House of Materials, Inc. v. Simplicity Pattern Co., 2 Cir., 298 F.2d 867 at 870, 871.[3]

This conclusion is supported by McElhenney Co. v. Western Auto Supply Company, supra, where Judge Soboleff said, referring to the prohibition against tie-ins in sec. 3 of the Clayton Act:

"Neither in terms nor inferentially does the statute prohibit a unilateral refusal to sell. Its condemnations are directed against executed transactions of lease, sale or contract containing the forbidden condition, agreement or understanding. Quite correctly the District Court pointed out that a mere refusal by a manufacturer to deal with a retailer who will not confine his dealings to the goods of the manufacturer does not run afoul of the section. The cases are unanimous in this: Nelson Radio & Supply Co. v. Motorola, Inc. 5 Cir., 1952, 200 F.2d 911, certiorari denied 1953, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356; Leo J. Meyberg Co. v. Eureka Williams Corp., 9 Cir., 1954, 215 F.2d 100, certiorari denied 1954, 348 U.S. 875, 75 S.Ct. 113, 99 L.Ed. 689; Brosious v. Pepsi-Cola Co., D.C.M.D. Pa.1945, 59 F.Supp. 429, affirmed 3 Cir., 1946, 155 F.2d 99; Allied Equipment Co. v. Weber Engineered Products, 4 Cir., 1956, 237 F.2d 879." 269 F.2d at 337–338.

Although the tying arrangement may be illegal per se, and give rise to criminal or civil action by the government or to private claims for damages such as those awarded under A above, the termination of a dealership in furtherance of such a plan or arrangement is not per se a violation of the antitrust laws; such a termination will not give rise to a claim for treble damages unless it amounts to an unreasonable restraint of trade.

A manufacturer may announce in advance the circumstances under which he will refuse to sell. The additional factors in the instant case consist of statements by Sinclair that its dealers would have to buy more TBA if they wanted to continue their dealerships (even though these threats were not enforced), the oral agreement to purchase some TBA made by plaintiff at the time of the execution of his second lease in 1948, and the pressure brought on plaintiff to purchase more Goodyear TBA after Sinclair spent $31,000 to remodel and enlarge the service station in 1953. Plaintiff did increase such purchases from about $1,000 or $2,000 a year to about $4,000 a year, but he still bought about ten times that amount from Firestone. It is quite evident, from the testimony at the original trial and the additional evidence offered at the recent hearing on the issue of damages (discussed under C below), that plaintiff was particularly interested in maintaining and building up his large business in Firestone TBA.[4] That business was different in kind as well as much greater in amount than the TBA business done by the ordinary lessee-dealer.

Plaintiff's activity in Firestone TBA had two effects: (1) it was an embarassment to Sinclair in its efforts to persuade

3. Emich Motors Corp. v. General Motors Corp., 340 U.S. 558, 71 S.Ct. 408, 95 L. Ed. 534 must be read in the light of United States v. General Motors Corp., 7 Cir., 121 F.2d 376, cert. den. 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497, in which "it was shown that defendant, reaching out to monopolize the business of financing the resale of automobiles of its manufacture, formed a conspiracy unreasonably to interfere with commerce." Miller Motors v. Ford Motor Company, 4 Cir., 252 F.2d 441 at 447.

4. In Reistertown itself, entirely apart from the Westminster store which was operated by a manager for a corporation then owned by plaintiff.

its other dealers to carry increasing amounts or percentages of Goodyear TBA, and (2) it consumed a certain amount of plaintiff's time and energy which Sinclair felt should be devoted to the development of the business at the service station.

Sinclair held the station under a lease which required it to pay rent to the owner, and it had spent a substantial sum in 1953 to improve the property. It was entitled to require that its lessee-dealer devote what it considered a satisfactory amount of time to the sale of its products rather than to the building up of an independent business in Firestone TBA.

The Sinclair officials believed that plaintiff was not devoting a sufficient amount of effort to his service station, and that this was reflected in his gasoline gallonage. Although I found that there was no just cause for complaint on that score, the Sinclair officials sincerely believed that plaintiff was not selling as much gasoline at the station as they thought he could and should have sold there after Sinclair had improved and enlarged the station in 1953. Their estimate of the potentiality of the station was too high, as was shown by the failure of the capable dealer who replaced plaintiff to come anywhere near the desired goal, but the estimate was sincerely made. The lease and sales agreement provided that it might be terminated by Sinclair at the end of any fiscal year. I find as a fact that Sinclair probably would have terminated plaintiff's lease and dealership in 1956 or 1957 for that reason, entirely apart from the fact that he was not buying enough Goodyear TBA, although, as I found originally, both reasons affected the actual decision to terminate in 1956 and neither reason predominated.

A producer should be free to discontinue his business relations with individual distributors or dealers who are not doing an effective job of selling, whether this ineffectiveness results from business ineptitude or from the fact that the dealer has diluted his efforts by handling other lines. See United States v. J. I. Case Co., D.Minn., 101 F.Supp. 856, 863. This important right of the producer, necessary to preserve the freedom of choice which is of the essence of competition, must be weighed against the nature and extent of the violation of the antitrust laws involved.

The prohibition against tie-in arrangements is an important provision, but the tie-in arrangement in the instant case did not involve the use of pressures comparable to those applied in the General Motors case,[5] for example, Sinclair did not demand that its dealers carry only Goodyear TBA; the evidence is clear that the dealers carried other TBA items. Sinclair did seek to require that each dealer carry a line of Goodyear TBA products, but did not generally enforce that requirement by cancelations of leases.[6] It is not necessary to decide in this case the effect of a termination made solely in furtherance of a tying arrangement. That purpose was combined with the belief of Sinclair's officials that plaintiff was not selling as much gallonage as they thought he should have sold, and that he was devoting too much effort to his separate retail business in Firestone TBA. Both factors, in the light of all the circumstances, must be considered in deciding whether the termination of the lease and dealer arrangement amounted to a violation of section 1 of the Sherman Act, giving rise to an action for treble damages.

█ In the light of all the circumstances, I find that the termination of the

5. 121 F.2d 376.

6. See 171 F.Supp. at pp. 42, 43. It still seems to me that Sinclair has a legitimate business interest in trying to arrange that a motorist on the highways who wishes to buy a particular make of tire, battery or other accessory sold by Goodyear may be sure of finding one at any Sinclair station throughout the country. However, obedient to my understanding of the opinion of the Fourth Circuit, I have not considered this factor in my present decision on any question presented.

lease was not an unreasonable restraint of trade, was not a per se violation of the antitrust laws, and does not give rise to a claim for treble damages under those laws.

C

■ Even if the termination had been such a violation of the antitrust laws as would give rise to an action for damages, the evidence on the issue of damages is highly speculative and unsatisfactory.

Plaintiff made no effort to discuss with any other company the possibility of taking over one of its stations in the Reisterstown area or of becoming a lessee of one of the new stations which have been opened at very good locations in or near Reisterstown during the years since 1956. He wanted the independence of a long term lease and to be free to develop his business as he saw fit. Accordingly, shortly after the termination of his Sinclair lease, he arranged with the owner of a property in Reisterstown which had been leased to the Gulf Oil Company to lease the property to him after the Gulf lease terminated on February 1, 1957.

Plaintiff negotiated the lease with the owner, the lease was made to Shell Oil Co. and Shell leased it to plaintiff for five years, with a five year renewal at half the rent Shell paid the owner. Plaintiff opened a Shell station there on February 12, 1957. Plaintiff wanted this property because it was well located and well designed for his Firestone TBA business, although it was not well located or designed for the sale of gasoline. Although his sales of gasoline there have been less than his sales at his Sinclair station, his average net earnings for the years 1958–1961 have been higher than his average net earnings during the period 1948–1955, while he was at the Sinclair station, even omitting the loss year 1953.

Plaintiff's claim for damages is based upon the assumption, supported only by his personal opinion,[7] that his gasoline sales would have increased at the rate of 10% per year at the Sinclair location, up to a maximum of 35,000 gallons per month. That assumption is contradicted by the experience of plaintiff during the years from 1946 to 1956, and by the experience of the capable dealer who took over the Sinclair station in June 1956. It is true that plaintiff increased his gasoline sales at the rate of about 10% from 1954 to 1955, and during the first five months of 1956, but that was after a very poor year (1953) while the station was being remodeled, and I find as a fact from all of the evidence that such an increase could not reasonably be expected to continue, in view of the deterioration of the Reisterstown business area in competition with new shopping centers a mile or so away, and the location of new service stations adjacent to or convenient to those shopping centers, as well as many new stations on the Reisterstown Road within a few miles of the Reisterstown business area.[8] Plaintiff's yearly increases at his Shell station in Reisterstown were made from a very low base. It would appear that plaintiff had a certain loyal following in the Reisterstown area, but he has never again achieved the gallonage which he sold in 1946, either at the Sinclair station before 1956 or at the Shell station thereafter. Most of the other service stations in the area have not increased their gallonage to any great extent, no doubt because of the continually increasing number of stations.

Moreover, it is impossible to correlate plaintiff's profits with the ups and downs of his gasoline gallonage over the years. Since plaintiff has averaged higher net profits at his present location than he did at his Sinclair station, he is probably wise in emphasizing his Firestone TBA business at the expense of some gasoline

7. Plaintiff's expert witness in effect admitted that he was an expert only in mathematical computations. In any event, I found his testimony without substantial value on any disputed question.

8. Plaintiff refused to consider an offer which Shell made to him about 1960 to lease a new Shell station at a very desirable location across from a shopping center on the Reisterstown Road a short distance south of Reisterstown.

gallonage. Plaintiff has not proved any loss for any period extending more than one year after termination of his lease. His damages for that period would approximate $12,000, most of which he would have sustained whenever his lease was terminated. Damages beyond that period would be too speculative for recovery under any legal theory.

## D

■ Since plaintiff won his case in the Court of Appeals, and has proved some damages, however modest, he is entitled also to receive an award for counsel fees. The fee should be a reasonable fee under all the circumstances. In the ordinary case the factors which should be considered in determining a reasonable fee are those set out in Canon 12 of the Canons of Professional Ethics of the American Bar Association, namely:

"In determining the amount of the fee, it is proper to consider: (1) the time and labor required, the novelty and difficulty of the questions involved and the skill requisite properly to conduct the cause; (2) whether the acceptance of employment in the particular case will preclude the lawyer's appearance for others in cases likely to arise out of the transaction, and in which there is a reasonable expectation that otherwise he would be employed, or will involve the loss of other employment while employed in the particular case or antagonisms with other clients; (3) the customary charges of the Bar for similar services; (4) the amount involved in the controversy and the benefits resulting to the client from the services; (5) the contingency or the certainty of the compensation; and (6) the character of the employment, whether casual or for an established and constant client. No one of these considerations in itself is controlling.

They are mere guides in ascertaining the real value of the service."

See also Cape Code Food Products v. National Cranberry Ass'n, D.Mass., 119 F.Supp. 242; Twentieth Century-Fox Film Corp. v. Brookside Theatre Corp., 8 Cir., 194 F.2d 846, at 859, cert. den. 343 U.S. 942, 72 S.Ct. 1035, 96 L.Ed. 1348.

This is an unusual case, for several reasons. The amount recovered is extremely small. But the legal principle established, albeit unwittingly, by counsel for plaintiff, is an important one, and one of the purposes of private treble damage suits is to prevent the necessity of government civil suits or prosecutions to establish and correct violations of the antitrust laws. With these considerations in mind, we turn to the facts.

Through June 1, 1962, including the hearing on remand, John S. McDaniel, Jr., a partner in the firm of Cable and McDaniel, spent 416 hours in connection with the prosecution of this case, Calhoun Bond, an associate until January 1, 1962, and a partner thereafter, spent 376 hours, and other associates 67 hours. McDaniel's regular hourly rates range from $35 to $50 per hour, Bond's from $15 to $20 before January 1, 1962, $25 to $35 thereafter. The rates for other associates range from $12.50 to $17.50. The conduct of the original trial prevented McDaniel's handling other assignments for a period of three weeks. The preparation and presentation of the case was painstaking. On the issue of damages counsel attempted to build an elaborate structure on a very inadequate foundation; defendant should not be required to pay for the time spent thereon.

Taking all factors into consideration, I conclude that counsel fees in the amount of $14,000 should be allowed.

An appropriate judgment order will be entered.