**S. Kriete OSBORN, Plaintiff,**

v.

**SINCLAIR REFINING COMPANY,**
**Defendant.**

Civ. No. 9769.

United States District Court
D. Maryland.

Feb. 24, 1959.

**38**

John S. McDaniel, Jr., Calhoun Bond, Cable & McDaniel, Baltimore, Md., for plaintiff.

David R. Owen, Wm. A. Fisher, Jr., Semmes, Bowen & Semmes, Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

This is a private antitrust suit under 15 U.S.C.A. § 15. Plaintiff claims that his service station lease and dealer's sales agreement were cancelled by defendant (Sinclair) in furtherance of an attempt by Sinclair to monopolize the sale of tires, batteries and accessories (TBA) to its service station dealers in Maryland and/or a combination or conspiracy between Sinclair and Goodyear Tire and Rubber Company (Goodyear) to restrain trade in those products.

### Facts.

Sinclair is a refiner and distributor of petroleum products in interstate commerce.

Sherwood Bros., Inc. (Sherwood), which had originally been an independent distributor of petroleum products in Maryland, became a wholly owned subsidiary of Sinclair in 1935. Thereafter it sold Sinclair petroleum products in most of Maryland and in small areas of adjacent states until the end of 1955, when Sherwood was merged into Sinclair. Since January 1, 1956, Sinclair has conducted, through its Sherwood Division, the business which had previously

been conducted by Sherwood. The term Sherwood will be used herein to include both Sherwood Bros., Inc., and the Sherwood Division of Sinclair unless the context otherwise requires.

Before it became a subsidiary of Sinclair, Sherwood had operated service stations with its own employees. About 1936, as a result of the enactment of the Wage and Hour and Social Security laws by Congress and of laws imposing "chain store taxes" in many states, Sinclair and Sherwood changed to a policy of leasing service stations to dealers. Thereafter Sinclair and Sherwood sought to avoid such control over their service station operations as would make them liable under those statutes.

Plaintiff was employed by Sherwood in 1932 as an attendant, and later as manager of its service station in Reisterstown, Baltimore County, Maryland, at the point where the Westminster and Hanover Roads join to form Reisterstown Road. In 1936 plaintiff leased the station from Sherwood; that lease was cancelled in 1948, and a new lease was executed, which continued on a year to year basis until May 31, 1956, when it was cancelled by Sherwood.

Goodyear is a manufacturer of tires and other products and a distributor of a full TBA line, which includes, besides tires and batteries, all sorts of car and home merchandise, from spark plugs to spot lights and from children's toys to motor boats and room coolers. Practically all Goodyear TBA sold in Maryland is manufactured outside the state.

Total sales of gasoline in Maryland were 638,000,000 gallons in 1952, 817,000,000 gallons in 1956. During the same period Sherwood's tax paid sales in Maryland increased from 77,000,000 to 87,000,000. Fourteen competitive brands of gasoline were sold in Maryland, sixteen of tires and tubes, fourteen of batteries, and numerous brands of oil filters, fan belts, spark plugs, and other TBA items.

In 1954–56 there were over 2,300 service station dealers in Maryland, including 1,000 in the metropolitan Baltimore marketing area, who were primarily engaged in selling gasoline, but also sold TBA. There were about 200 other TBA dealers in the state, half of them in the Baltimore area. There were some 300 service station dealers in Maryland selling Sinclair products, including some 200 in the metropolitan Baltimore district. About 300 other outlets—stores, garages, etc.—sold Sinclair petroleum products.

In 1956 there were 28 establishments selling gasoline in Reisterstown and the surrounding area, of which 22 sold various brands of TBA; there was one automotive supply store. On the Reisterstown Road, in Reisterstown proper, there were two Sinclair stations, two Esso stations, one Sunoco station, and a third large Sinclair outlet.

Goodyear sold TBA to a large number of contract dealers, such as tire stores and service stations, which had a sufficient volume of business to qualify for the various discounts allowed to dealers. All such dealers were billed by Goodyear at the list price less the applicable discount based on the volume of the dealer's purchases, except that in some cases a greater discount was allowed to meet competition. In addition, Goodyear paid bonuses (really additional discounts) based on total annual purchases. The contract dealers sold retail to consumers and wholesale to smaller service station dealers, tire dealers, truck operators and commercial consumers. Goodyear itself operated stores, which sold wholesale and retail.

While Sherwood operated service stations with its own employees it sold Firestone TBA through those stations. After the stations were leased to dealers Sherwood had an oral arrangement with Firestone under which it received a commission from Firestone in connection with promotion and sale of Firestone products through its lessee-dealers. Sinclair had similar oral arrangements with Goodyear. Some time after Sherwood had become a subsidiary of Sinclair, Sherwood terminated its arrangement

with Firestone and made a similar oral arrangement with Goodyear.

In 1944 the Sherwood-Goodyear agreement was reduced to writing in the form of a letter from Goodyear to Sherwood, which read in part as follows:

"We now confirm discussions with you relative to services to be rendered by you during the balance of the year 1944, and thereafter from month to month unless cancelled by either party on thirty (30) days' written notice to the other, in promoting the sale of Goodyear tires (casings and tubes), batteries and merchandise listed in Sections I, II and III of our Car and Home Supply Catalog as supplemented from time to time (referred to herein as car and home merchandise), through such independent resale outlets as are otherwise engaged in or propose to engage in the sale of your products and as are agreed upon in writing with you from time to time.

"During the period mentioned it is understood that you will actively assist us in selling and in promoting the sale of the above merchandise to such customers, and at our request from time to time you will have your field representatives call upon these customers in company with our salesmen and otherwise, and will cooperate and assist us in our efforts to promote and encourage the sale of such merchandise by the customers to whom such sales shall be made by us. The right to accept or reject any order received from any customer shall at all times rest with us.

"You will see that your field offices work energetically with us with the view to assisting us to the fullest practicable extent in perfecting arrangements with all such customers. You will at all times maintain adequate, qualified personnel to render the services called for hereunder regularly and efficiently."

. The agreement provided that Goodyear should pay Sherwood a 10% commission on tires and batteries sold to Sherwood dealer outlets, a 7½% commission on such products sold to Sherwood distributors, and commissions of 5% to 10% on car and home merchandise. Sherwood was prohibited from paying any part of these commissions to its customers.

Also in 1944 the first written agreements were entered into between Sinclair and Goodyear. A "tire and battery letter" provided for the sale by Goodyear to Sinclair of tires, tubes and batteries for resale to Sinclair TBA franchise holders [1] who maintained an inventory of Goodyear merchandise. Sinclair never had physical possession or risk of loss of such merchandise or more than instantaneous title thereto. Orders were sent directly to Goodyear by the franchise holders and the merchandise was shipped by Goodyear to them. Service station dealers gave orders for Goodyear merchandise to Sinclair salesmen and to Goodyear salesmen, as well as to salesmen for the franchise holders. These salesmen transmitted all orders to the franchise holders. Under this purchase-and-resale plan Sinclair promoted the sale of Goodyear merchandise in much the same way as Sherwood did under the sales-commission plan. In addition, Sinclair and its franchise holders handled all adjustments for defective merchandise, and Sinclair handled billing, crediting and collecting, and bore the credit risk. It is obvious that the arrangement embodied in the tire and battery letter could not be successful, and Sinclair would not get any benefit therefrom, if Goodyear sold many tires, tubes and batteries directly to Sinclair service stations. There was always, however, active competition between Sinclair's franchise holders and other Goodyear distributors.

A "car and home letter" similar to the 1944 Sherwood-Goodyear letter agreement, provided for the payment of commissions by Goodyear to Sinclair on sales

---

1. The letter also covered the resale of such merchandise by Sinclair through its company-operated outlets, but none of these are involved in this case.

of car and home merchandise by Goodyear to resellers of Sinclair petroleum products. The car and home merchandise which was marketed by Goodyear was generally sold under the trade name of some other well known manufacturer, and was almost always available from other sources.

There was no contractual or other legal obligation on any Sherwood or Sinclair lessee dealer to purchase Goodyear TBA or to refrain from purchasing other TBA products. The dealers could obtain the benefits of volume purchases from other tire manufacturers and TBA marketers. In practice the Sherwood dealers purchased various types, brands and quantities of competitive TBA products from other suppliers. Sinclair and Goodyear agreed:

"* * * that under its policy Sinclair does not undertake to, and will not in fact, exercise or attempt to exercise any control or authority, directly, indirectly, by coercion or otherwise, over a dealer or any phase of the conduct of his business, regardless of whether or not Sinclair may own in fee or hold under lease the site or other station facilities occupied and operated by the dealer as an independent contractor and merchant in his own right; and that Sinclair specifically requests that Goodyear not ask or expect that such control or authority be exercised; and that Goodyear will not permit its salesmen or other field or office representatives to undertake to exercise such control or authority in connection with any phase of the agreement."

This policy was incorporated in Sinclair's operating manuals, used by Sherwood.

Neither Sherwood nor Sinclair sold or promoted the sale of Goodyear TBA products to persons other than Sherwood or Sinclair dealers. The various agreements with Goodyear contemplated only the promotion of TBA sales to existing or prospective retail distributors of Sinclair petroleum products and the purchase by Sinclair [2] of tires and batteries for resale to such retail distributors. The principal purpose of Sherwood and Sinclair in effecting these agreements was to supply a full line of TBA products to the service stations handling Sinclair petroleum products. The parties are agreed that it is desirable for a dealer to be able to furnish one-stop service to the motoring public and that the availability of a complete line of TBA at a service station attracts customers for gasoline, oil and the other services the dealer offers. Under the agreement which Sherwood and Sinclair had with Goodyear, there was available to their dealers a convenient source of supply of TBA products nationally advertised under well-known brand names. The dealer could expect prompt deliveries and therefore did not need to carry excessive inventories. He could sell Goodyear tires, tubes, batteries and some other Goodyear TBA products on Sinclair credit cards without extending credit himself. The Sherwood-Sinclair service station dealers derived certain benefits from the agreements between Sherwood-Sinclair and Goodyear, although they could have obtained most of the benefits from handling other nationally advertised brands of TBA.

The 1944 Sherwood-Goodyear agreement was in effect when Sherwood became a division of Sinclair on January 1, 1956. Thereupon, the Sinclair-Goodyear "tire and battery" and "car and home" letter agreements became applicable to the Sherwood Division. The change made very little difference in net earnings to Sherwood, and had no effect upon the prices which Sherwood dealers paid for Goodyear TBA.

Before January 1, 1956, Goodyear had solicited direct purchases of tires, tubes and batteries by Sherwood service station dealers, and had paid Sherwood a commission on all such sales. After January 1, 1956, Brooks-Huff Tire Company, which had been a Goodyear tire and

---

**2.** And by Sherwood after January 1, 1956.

battery dealer in Baltimore, gave up its Goodyear franchise and became a Sinclair franchise holder. Thereafter Goodyear did not solicit direct purchases of tires, tubes and batteries by Sherwood dealers in the metropolitan Baltimore area. Such sales were made either by Brooks-Huff or by another Sinclair franchise holder, except in those isolated instances where a service station dealer preferred to buy direct from Goodyear. After January 1, 1956, Sherwood received a profit on all sales made by it to Brooks-Huff, but received no profit or commissions on any sales of tires, tubes and batteries made by Goodyear direct. Before 1956 plaintiff had purchased Goodyear TBA direct from Goodyear. Shortly after January 1, 1956, a Sherwood sales representative told plaintiff that he was no longer a Goodyear distributor and that he should purchase Goodyear tires, tubes and batteries from Brooks-Huff. About the same time a Goodyear salesman said that he would no longer accept orders from plaintiff for such merchandise. However, plaintiff could purchase Goodyear tires, tubes and batteries from Brooks-Huff on the same terms and discounts that he had purchased them directly from Goodyear prior to January 1, 1956, and plaintiff could and did purchase Goodyear car and home products directly from Goodyear both before and after January 1, 1956.

Other Goodyear distributors in Baltimore and elsewhere continued to compete for the TBA business of the Sherwood dealers, and plaintiff also continued to purchase all kinds of TBA products from wholesale houses in Baltimore, Reisterstown, Westminster, or wherever he chose.

Sherwood regarded Goodyear TBA in its entirety as one of the Sherwood lines, and was not pleased when its dealers carried a large stock of other TBA products. Sherwood and Sinclair believed that both they and their dealers would benefit if the dealers handled an appropriate quantity of TBA and they naturally preferred that the dealers carry the Goodyear line.

The purchase of Goodyear TBA was discussed by Sherwood with prospective lessees. They were told that there was a general identity between the names of Sinclair and Goodyear across the country and that Sherwood liked to see those names held together so far as its service to the motoring public was concerned. The normal procedure was to sign the lease and dealer sales agreement and to secure the initial TBA order simultaneously. Sherwood impressed on its sales personnel the desirability of dealers carrying 100% Goodyear TBA products. They, in turn, used their best efforts to persuade the dealers to purchase Goodyear TBA in preference to other lines.

It was not the practice of Sherwood or Sinclair to prohibit their dealers from displaying on the leased premises signs advertising TBA products other than Goodyear TBA. They frequently requested dealers to remove such signs but they did not force the dealers to remove them and many Sherwood stations displayed signs advertising other brands of TBA.

Sherwood established annually TBA quotas for each of the territories covered by its sales representatives, but did not ordinarily assign quotas to each individual service station dealer. The sales representatives usually discussed with their dealers the level of Goodyear TBA sales which they thought such dealers should reach. Sherwood distributed through its sales representatives blank forms to be used by a dealer in calculating his potential and actual TBA business, but did not require that all dealers use them. Field employees prepared reports showing what brands of TBA were displayed for sale by the several dealers. Nearly all of them handled some Goodyear TBA but no dealer handled Goodyear TBA exclusively.

Sherwood held a sales meeting each spring, at which the dealers were exhorted to greater efforts by John R. Sherwood, president of the company. The principal emphasis was on gasoline gallonage, but he made it clear year after year that he was dissatisfied with the

TBA sales. There is a conflict in the testimony as to what was said at a particular meeting in or about 1949. It is difficult for any one to remember exactly what was said on such an occasion ten years ago, but I find that the dealers understood and Sherwood intended them to understand that unless they purchased more Goodyear TBA some of the leases would be terminated.[3] Around 1950 Sherwood set a goal of a million dollars of TBA sales, which was not reached until 1958. Sinclair had calculated that $35 of TBA sales per 1,000 gallons of gasoline sales was a reasonable quota, and the Sherwood service station dealers as a whole were buying only about one-half of that amount. Of course, some dealers were buying at much higher levels than others. The tire companies had figured the service station potential at $135 of TBA retail sales per 1,000 gallons of gasoline; that would have meant $90 wholesale per 1,000 gallons, so the Sherwood quota of $35 per 1,000 gallons does not appear unreasonable.

Sherwood kept records of the purchases of Goodyear TBA by its dealers and considered this item along with others in determining whether to renew or terminate a dealer's lease at the end of each year. The final decision was made on the basis of the dealer's overall performance. The most important factor considered was the total gallonage of gasoline sold by the dealer. Besides TBA, other factors considered included cleanliness of the station, hours of operation, quality of service offered the public, personal interest and attentiveness of the dealer to the operation of the station, and the increase or decrease in the volume of sales from year to year.

In addition to being the lessee of a Sherwood service station in Reisterstown, plaintiff operated a Firestone TBA business in connection therewith and was the sole stockholder of a corporation which operated a Firestone store in Westminster.[4] During the period that plaintiff was a Sherwood dealer, he sold much larger quantities of Firestone than Goodyear TBA. He told Sherwood that Firestone would remain his major line, but that he would also carry Goodyear and let the public choose between them.

His first lease was cancelled by Sherwood in 1948 because of the decline in the gasoline gallonage and because plaintiff was not handling enough Goodyear TBA products. Following a conference, at which plaintiff had agreed to place an order for over $1,000 worth of Goodyear TBA, Sherwood's sales manager decided to give him another chance, and signed a new lease. Plaintiff thereafter bought some Goodyear TBA, but he continued to buy more than ten times as much Firestone TBA.

Although Sherwood's sales representatives told plaintiff over the years that he ought to buy more Goodyear TBA products, they neither stated explicitly nor implied clearly that he had to do so in order to keep his lease.

The second lease provided for a rental equal to 1½¢ per gallon of gasoline and motor fuels delivered to the station, with a minimum of $400 per month. However, in accordance with its general custom, Sherwood waived the minimum rent and accepted lower amounts per gallon over a period of several years before and during the rebuilding and enlargement of the station in 1953–54. The lease and the dealer sales agreement which supplemented it contained provisions for termination by either party at the end of the original term or any successive yearly term, on thirty days' notice.

The service station leased to plaintiff occupied the best location in the Reisters-

3. The testimony dealing with the conversations among the dealers immediately following Mr. Sherwood's speech is admissible to show their understanding of what he had said, and by inference therefrom what he had intended them to understand. So is plaintiff's testimony as to what he had understood Mr. Sherwood's statements to mean. Linden v. United States, 4 Cir., 254 F.2d 560; Haid v. United States, 9 Cir., 157 F.2d 630; Wigmore on Evidence, § 1790.

4. Plaintiff was also the owner of a 437-acre farm in Carroll County.

town area. This was an important factor in inducing Sherwood to rebuild and enlarge the station in 1953. In 1954, after the station had been rebuilt, a Sherwood representative (DeHuff) asked plaintiff what he intended to do about Goodyear TBA. Plaintiff replied that he intended to carry and display Goodyear along with Firestone, but that he could not economically get rid of his Firestone franchise. DeHuff said that one way Sherwood expected to recover the expenses of the rebuilding was by plaintiff handling more Goodyear TBA.

The fact that plaintiff carried so much more Firestone TBA than Goodyear TBA was one of the factors, along with others affecting the complete operation of the station, considered by the sales representative each year in making up his mind whether to recommend to his superiors that plaintiff's lease be renewed or terminated, and by the sales manager in making the final decision.

When the responsible individuals at Sherwood considered whether to renew or terminate plaintiff's lease in the spring of 1956, they thought that his gallonage had not increased in 1955 to the extent that it should have increased, considering the recent expenditure of $31,000 for the enlarged station.

I find that those two factors—gasoline gallonage and TBA problems—substantially contributed to Sherwood's decision to cancel the lease in 1956. I do not find that either of the two factors was predominant.[5]

Plaintiff suffered damage as a result of the cancellation, but it was agreed at a pretrial conference that no proof of the amount of such damage should be offered until after it has been determined whether there was any violation of the antitrust laws. Plaintiff did not prove that he suffered any other damage as a result of the alleged violations

### Discussion.

■■ It is a settled principle of law that in the absence of a purpose to create or maintain a monopoly a manufacturer or a distributor has the right freely to exercise his independent discretion as to the parties with whom he will deal. United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992; Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 625, 73 S.Ct. 872, 97 L.Ed. 1277; Schwing Motor Co. v. Hudson Sales Corp., D.C.Md., 138 F. Supp. 899, 902, affirmed 4 Cir., 239 F.2d 176, certiorari denied 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38; Miller Motors Inc. v. Ford Motor Co., 4 Cir., 252 F.2d 441, 451; Nelligan v. Ford Motor Co., 4 Cir., 262 F.2d 556; Hudson Sales Corp. v. Waldrip, 5 Cir., 211 F.2d 268, 274, certiorari denied 348 U.S. 821, 75 S.Ct. 34, 99 L.Ed. 648; Nelson Radio & Supply Co. v. Motorola, Inc., 5 Cir., 200 F.2d 911, 915, certiorari denied 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356. Sinclair has the right, acting independently, to refuse to renew a service station lease for the reason that the dealer has failed to sell Goodyear TBA, or to sell it in sufficient quantities, or to sell it exclusively. Furthermore, Sinclair can announce such requirements in advance of entering into a lease or in advance of a renewal date.

■■ On the other hand, a manufacturer or distributor loses his right to refuse to deal if such refusal is in furtherance of a conspiracy in restraint of trade under sec. 1 or of an attempt to monopolize under sec. 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2. But the mere fact that Goodyear and Sinclair have entered into marketing agreements does not per se restrict Sinclair's right to terminate its leases for any reasons it sees fit.

Since the marketing agreements do not contain any provisions which in and of themselves violate the antitrust laws, we

5. This, however, would not be fatal to plaintiff's claim for damages sustained as a result of the cancellation if he had shown a combination in restraint of trade or an attempt to monopolize in violation of the Sherman Act, and that such il-

legal motive substantially contributed to the decision to cancel. Momand v. Universal Film Exchange Inc., 1 Cir., 172 F. 2d .37. See also Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544.

must consider whether they were used to violate those laws.

Plaintiff concedes that he has not proved a tying arrangement which violates sec. 3 of the Clayton Act, 15 U.S. C.A. § 14. Neither the lease nor the dealer agreement was made upon any condition, agreement or understanding that plaintiff refrain from buying or selling TBA products other than Goodyear's. Plaintiff must show that Sinclair's conduct violated the Sherman Act by imposing or attempting to impose an unreasonable restraint on interstate commerce. Northern Pacific Railway Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545; Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456; Times-Picayune Publishing Co. v. United States, supra; Chicago Board of Trade v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683; Klor's, Inc. v. Broadway-Hale Stores, Inc., 9 Cir., 255 F.2d 214.

Plaintiff does not contend that every restraint on interstate commerce involves a violation of the antitrust laws, even though the restraint may involve a substantial amount of commerce; he does contend that if he proves an unreasonable restraint of a not insubstantial amount of interstate commerce, such unreasonable restraint is presumed to be a public injury.

Plaintiff contends that the relevant market is the market for TBA products among Sinclair lessee dealers in the Sherwood division. If there were such a restraint of trade or attempt to monopolize as existed in International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, Standard Oil Company of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, and Northern Pacific Railway Co. v. United States, supra, the volume of TBA purchases by the Sinclair dealers in the Sherwood division would constitute a not insubstantial amount of commerce. In those three cases, however, there was a clear restraint of trade or attempt to monopolize, apparent from the provisions of the written contracts themselves. No such per se violation is apparent in the present case, for neither the letter-contracts between Sherwood-Sinclair and Goodyear nor the agreements between Sherwood and its dealers contain any similar provisions. Any possible intent to monopolize or to unreasonably restrain trade in this case must be gleaned from the way in which the agreements were used. In deciding whether an illegal intent existed, the general market for TBA products in the metropolitan Baltimore area and elsewhere in Maryland must be considered; the same market must also be considered in deciding whether there was any actual monopoly or restraint of trade. United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264; Times Picayune Publishing Co. v. United States, supra; Klor's, Inc. v. Broadway-Hale Stores, Inc., supra.

Plaintiff relies strongly on the GMAC case, United States v. General Motors Corporation, 7 Cir., 121 F.2d 376, certiorari denied 314 U.S. 618, 62 S.Ct. 105, 86 L.Ed. 497, rehearing denied 314 U.S. 710, 62 S.Ct. 178, 86 L.Ed. 566, to support his contention that Sinclair was using its natural monopoly of its own brand-name petroleum products to invade the TBA field. The instant case, however, is very different from the General Motors case: (1) General Motors required dealers to promise to use GMAC financing exclusively. Sinclair did not require its dealers to use Goodyear TBA exclusively or to promise to use it exclusively. (2) The scheme to require GMAC financing bore no relation to the good will of General Motors or to its line of cars. It is conceded that Sinclair had a valid interest in seeing that its dealers carried a full line of high quality TBA, and I have found as a fact that the dealers, as well as Sinclair, derived certain benefits from the TBA arrangements with Goodyear. The predominant motive which Sherwood and Sinclair had for entering into the agreements with Goodyear was a legitimate business motive.

Times-Picayune Publishing Co. v. United States, 345 U.S. at page 622, 73 S.Ct. at page 887; Chicago Board of Trade v. United States, 246 U.S. at page 238, 38 S.Ct. at page 243. (3) General Motors dominated the automotive field. Sinclair has no such dominant position in the petroleum field in Maryland or elsewhere.[6] (4) Sinclair was not using its economic position as a refiner and distributor of petroleum products to invade and dominate the TBA business. Times-Picayune Publishing Co. v. United States, supra; Miller Motors Inc. v. Ford Motor Co., supra; Klor's, Inc. v. Broadway-Hale Stores, Inc., supra. The evidence does not support plaintiff's contention that Sherwood or Sinclair had either the intent or the purpose to monopolize the TBA market. There are many brands of TBA merchandise available to service station dealers and to consumers. Plaintiff and the other Sherwood-Sinclair dealers whom he called as witnesses showed that in practice Sinclair dealers carry other brands of TBA as well as Goodyear

Nor is there any evidence of a conspiracy between Sherwood-Sinclair and Goodyear to restrain trade in the TBA market. It has been noted that every contract is to some extent a restraint of trade, but not every contract amounts to a conspiracy in violation of the Sherman Act. Chicago Board of Trade v. United States, 246 U.S. at page 238, 38 S.Ct. at page 243. "It is not sufficient for the plaintiff to prove a co-operative effort between [Sinclair and Goodyear], but it must be shown that the combination had the objectionable features which the act is designed to prevent." Miller Motors, Inc. v. Ford Motor Co., 252 F.2d at page 446.

The TBA agreements between Sinclair-Sherwood and Goodyear have not resulted in any increase in the wholesale prices charged to dealers or retail prices charged to the public. Goodyear TBA products compete with those of Firestone, Goodrich and other manufacturers and distributors on the basis of price, quality and other relevant factors.

Since there was no per se violation of the antitrust laws, plaintiff had to prove facts which show public injury from the alleged attempt to monopolize. Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311; Times-Picayune Publishing Co. v. United States, 345 U.S. at page 614, 73 S.Ct. at page 883; Radovich v. National Football League, 352 U.S. at page 453, 77 S.Ct. at page 394; Glenn Coal Co. v. Dickinson Fuel Co., 4 Cir., 72 F.2d 885; Schwing Motor Co. v. Hudson Sales Co., supra; Miller Motors, Inc. v. Ford Motor Co., supra; Klor's, Inc., v. Broadway-Hale Stores, Inc., supra. The keen competition between suppliers for the service station business prevents control of wholesale prices by the Sinclair-Goodyear arrangement. There is no evidence in this case of any horizontal price fixing agreements between any of the tire companies or any of the oil companies with respect to TBA. Nor is there any suggestion of "price leadership" in the TBA business in Maryland. The public has a choice of brands at Sinclair stations, and is free to buy any of the competing brands at service stations operated by other companies and at all sorts of other retail outlets. The Goodyear TBA products compete with those of other manufacturers and distributors on the basis of price, quality and all other relevant factors. Plaintiff has failed to prove any injury to the public from the Sinclair-Goodyear marketing arrangement.

No violation of the antitrust laws has been shown. Let judgment be entered in favor of the defendant, with costs.

---

6. Although this fact might not be important if there were clear restraints in the agreements themselves, as there were in International Salt, Standard Stations and Northern Pacific, it should be considered in determining whether there was any unreasonable restraint of trade.