S. Kriete OSBORN, Appellant,

v.

SINCLAIR REFINING COMPANY, Appellee.

No. 7899.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 17, 1959.

Decided July 11, 1960.

Argument on Petition for Rehearing

Jan. 26, 1961.

Rehearing Denied Feb. 28, 1961.

John S. McDaniel, Jr., Baltimore, Md. (Cable & McDaniel and Calhoun Bond, Baltimore, Md., on brief), for appellant.

David R. Owen, Baltimore, Md. (William A. Fisher, Jr., and Semmes, Bowen & Semmes, Baltimore, Md., on brief), for appellee.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOBELOFF, Chief Judge.

■ Once again, as in McElhenney Co. v. Western Auto Supply Co., 4 Cir., 1959, 269 F.2d 332, this court is faced with a problem arising from a manufacturer's refusal to continue selling to a dealer because of the latter's failure to accede to the seller's wishes with regard to products carried. This time the question arises in the context of the petroleum industry, and the particular issue is whether there existed between the Sinclair Refining Company and its customers an illegal tying arrangement prohibited by section 1 of the Sherman Act, 15 U.S.C.A. § 1. Northern Pac. R. Co. v. United States, 1958, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545. In its opinion, the District Court set out in detail the facts of the case, and, as those findings are not contested on this appeal, we are concerned only with the legal conclusion to be drawn from them.

Sherwood Bros., Inc., formerly an independent distributor of petroleum products in Maryland, became, in 1935, a wholly owned subsidiary of Sinclair, selling Sinclair products in Maryland and in some areas of adjacent states. In 1955, it was merged with Sinclair. Either name will hereafter be used to refer to the defendant. The plaintiff, Osborn, operated a filling station in Maryland carrying Sinclair petroleum products from 1936 to 1948, as an independent dealer under a lease and sales agreement with Sinclair-Sherwood. In the latter year, his lease was terminated and a new lease was entered into which continued until May 31, 1956, when it was cancelled by Sinclair. One of the reasons for the second cancellation and the present litigation was that the plaintiff failed to purchase sufficient quantities of Goodyear Tires, Batteries and Accessories (TBA).

Soon after Sherwood became a subsidiary of Sinclair in 1935, it entered into oral agreements with the Goodyear Tire and Rubber Company under which Sherwood received a commission from Goodyear in connection with the sale of Goodyear products to Sherwood dealers. The Sherwood-Goodyear agreement was reduced to writing in 1944. According to its terms, Sherwood agreed to "actively assist" Goodyear in "selling and in promoting the sale" of Goodyear TBA to Sherwood's dealers, and in return, Goodyear was to pay Sherwood a 10% commission on tires and batteries sold to Sherwood's dealers and commissions of 5% to 10% on car and home merchandise. Also in 1944, Sinclair and Goodyear entered into similar written agreements. There were further details in the contracts, set out in the District Court's opinion, concerning the methods by which orders were taken, adjustments for defective merchandise, billing, collecting, etc.

Because of its financial interest in having its lessee-dealers sell Goodyear TBA rather than competing brands, Sinclair-Sherwood engaged in a course of conduct designed to bring about this result. The facts in this case utterly fail to reveal any other business motive for the defendant's policy that its dealers should handle Goodyear products instead of others. Admittedly, it was proper for Sinclair-Sherwood to desire its lessees to carry a complete, high quality line of TBA. It is conceded, however, that there were other competing brands, and there is no suggestion that Goodyear was superior to other brands of TBA or that there was any benefit to the dealers in handling Goodyear rather than one of the other lines. The plaintiff, in addition to being a lessee of a Sinclair filling station, also operated a Firestone store in a nearby town where he sold that company's TBA. At his filling station, he carried both Goodyear and Firestone TBA, telling Sinclair-Sherwood that he would handle both and let the public choose between them. Firestone, however, remained his major line, and this was responsible, partly at least, for his troubles.

The District Court, after considering all of the evidence presented, concluded that the plaintiff had failed to prove a violation of the anti-trust laws, and gave judgment for the defendant, Sinclair-Sherwood. In this appeal, the plaintiff asserts that there exists a forbidden attempt to monopolize, that the contracts between Sinclair and Goodyear constituted an illegal restraint of trade,[1] and interspersed throughout these arguments are assertions that Sinclair's coercion of its dealers fell within the ban of such tie-in cases as Northern Pac. R. Co. v. United States, 1958, 356 U.S. 1, 78 S.Ct. 514, and International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20.

Although it was shown that the sale of gasoline by Sinclair-Sherwood in Maryland constituted slightly more than 10% of the total sale of gasoline sold in that state during the years immediately prior to the cancellation of the plaintiff's dealership, and that there were in this period 320 Sinclair service stations out of a total of about 2300 service stations in Maryland, the District Judge pointed out that, with regard to TBA, the plaintiff had failed to prove any intent to monopolize or to demonstrate that the economic effects of the agreements between Sinclair-Sherwood and Goodyear were such that those agreements themselves involved an unreasonable restraint of trade. As to the plaintiff's remaining contention, the court concluded that there was in this case no unreasonable per se restraint of trade, such as existed in Standard Oil Co. of California v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (primarily involving exclusive dealing), and in International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 and Northern Pac. R. Co. v. United States, 1958, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (concerned with tie-ins). The court found, however, that if such a tying arrangement had existed, "the volume of TBA purchases by the Sinclair dealers in the Sherwood division would constitute a not insubstantial amount of commerce," [171 F.Supp. 45] so as to make the per se classification of unreasonableness applicable. Because of the view we take of this case, it will be necessary to deal in detail with this last issue only.

Under the findings of the District Court, not disputed on this appeal, it is clear that an illegal tie-in arrangement existed between Sinclair-Sherwood and its dealers. Many of the findings demonstrate the pressure exerted against the Sinclair dealers to carry Goodyear TBA rather than competing brands. The District Judge observed that Sinclair-Sherwood "was not pleased when its dealers carried a large stock of other TBA products," and that, when Sinclair-Sherwood signed prospective lessees

"[t]he normal procedure was to sign the lease and dealer sales agreement and to secure the initial TBA order simultaneously. Sherwood impressed on its sales personnel the desirability of dealers carrying 100% Goodyear TBA products. They, in turn, used their best efforts to persuade the dealers to purchase

1. It is interesting to note that this same type of contract between oil companies and manufacturers of TBA is presently under attack before the Federal Trade Commission. See the initial decisions, filed October 23, 1959, in: In the Matter of B. F. Goodrich Company and The Texas Company, Docket No. 6485; In the Matter of The Goodyear Tire & Rubber Company and The Atlantic Refining Company, Docket No. 6486; and In the Matter of The Firestone Tire & Rubber Company and Shell Oil Company, Docket No. 6487. The complaints, in those cases, attacked both the agreements be-tween the oil and rubber companies and also the alleged coercion by the oil companies in forcing their dealers to handle certain sponsored brands of TBA. The hearing examiner upheld the contracts between the oil and rubber companies against the charge of unreasonably restraining trade. The examiner, however, did find that the gasoline dealers were coerced and forced to buy substantial quantities of the specified brands of TBA, and ordered them to cease and desist from such coercion and from threatening to cancel leases unless the dealers purchased the sponsored TBA products.

Goodyear TBA in preference to other lines."

Of course, a seller may attempt to persuade a buyer to purchase his products rather than those of his competitors, and such salesmanship efforts do not run afoul of the anti-trust laws, unless the sale of one product (the tying product) is made under an agreement, arrangement or condition under which the buyer must also purchase another (the tied) product. The findings compel the legal conclusion that such an agreement, arrangement or condition existed, and that if a dealer desired to continue selling Sinclair gasoline under the lease and sales agreements, he had no choice but to buy, as well, substantial quantities of Goodyear TBA.

At sales meetings held every spring, the dealers were warned by the president of Sherwood that he was dissatisfied with their Goodyear TBA sales. With regard to one meeting in 1949, the District Judge said: "I find that the dealers understood and Sherwood intended them to understand that unless they purchased more Goodyear TBA some of the leases would be terminated." In 1950, Sinclair-Sherwood set as a goal $1,000,000 of TBA sales and "calculated that $35 of TBA sales per 1,000 gallons of gasoline sales was a reasonable quota."

The court also found that: "Sherwood kept records of the purchases of Goodyear TBA by its dealers and considered this item along with others in determining whether to renew or terminate a dealer's lease at the end of each year." The above findings demonstrate that Sinclair-Sherwood's efforts to induce their dealers to carry a substantial quantity of Goodyear TBA went beyond mere persuasion or salesmanship to effectuate Sinclair-Sherwood's policy and constituted an actual requirement and condition for the continued sale of gasoline under their leases.

Although, standing alone, the above general findings do not, perhaps, disclose a tie-in accomplished by express agreement with the dealers, such an express contract is not necessary. In McElhen-

ney v. Western Auto Supply Co., 4 Cir., 1959, 269 F.2d 332, 338, this court pointed out:

"Probably nothing is more firmly settled in our anti-trust jurisprudence than that an illegal contract may be inferred from all of the circumstances. Admittedly, the written agreement between the parties contains no provision requiring the franchisees to deal only in goods supplied by Western Auto. This, of course, merely means that the contract is not unlawful on its face. The writing could be supplemented by an extrinsic course of conduct from which the illegal condition or understanding might be found. * * * *"

In that case we found the pleadings deficient because they failed to allege sufficient facts to constitute such an illegal tying arrangement. We remanded the case to give the plaintiff an opportunity to amend his pleadings to allege such an agreement, if he properly could.

In the instant case, however, more is revealed than an inferred illegal arrangement through a course of conduct. With regard to the cancellation of the plaintiff's first lease in 1948 and the signing of his second lease, the termination of which gave rise to the present controversy, the District Judge found:

"His first lease was cancelled by Sherwood in 1948 because of the decline in the gasoline gallonage and because plaintiff was not handling enough Goodyear TBA products. Following a conference, at which plaintiff had agreed to place an order for over $1,000 worth of Goodyear TBA, Sherwood's sales manager decided to give him another chance and signed a new lease. Plaintiff thereafter bought some Goodyear TBA, but he continued to buy more than ten times as much Firestone TBA."

From this it clearly appears that the plaintiff's second lease, the cancellation of which occurred in 1956, was actually

made in pursuance of an express oral agreement to purchase Goodyear TBA.

■ As to the termination of the second lease, the Judge concluded that both the plaintiff's failure to sell sufficient gasoline and his refusal to purchase more Goodyear TBA contributed to Sinclair-Sherwood's decision to cancel, neither of the two factors being predominant. The District Judge correctly pointed out that such combination of factors would not defeat the plaintiff's claim as long as the illegal motive substantially contributed to the decision to cancel. See: Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Momand v. Universal Film Exchanges, Inc., 1 Cir., 1948, 172 F.2d 37.

■ Despite the above findings of fact, and the further finding that the volume of TBA purchases by Sinclair-Sherwood dealers constituted a not insubstantial amount of commerce, the District Court held that the plaintiff had failed to prove an illegal per se tying arrangement. The court apparently predicated its legal conclusion upon the fact that there was no unreasonable per se restraint of trade in the written contracts with the dealers or in the agreements between Sinclair-Sherwood and Goodyear and that Sinclair-Sherwood did not require the dealers to carry Goodyear TBA exclusively. Having reached the conclusion that there was no per se violation the District Judge held that, in order for the plaintiff to recover, it was necessary for him to show that the public had been injured by the manner in which the business had been carried on under the agreements; and the District Judge then found that the plaintiff had failed to prove such injury and therefore no violation of the anti-trust acts had been shown.[2] As previously noted, however, an agreement, arrangement, or condition which unreasonably restrains trade in itself by price fixing, boycotts, or tie-ins, need not be expressly embodied in written contracts. Such arrangements may be deduced from a course of conduct. United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505; McElhenney v. Western Auto Supply Co., 4 Cir., 1959, 269 F.2d 332. In addition, the plaintiff's second lease seems to have been entered into under the express oral agreement that he would purchase sub-

---

2. The court stated:

"If there were such a restraint of trade or attempt to monopolize as existed in International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; Standard Oil Company of California v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, and Northern Pacific Railway Co. v. United States, supra, the volume of TBA purchases by the Sinclair dealers in the Sherwood division would constitute a not insubstantial amount of commerce. In those three cases, however, there was a clear restraint of trade or attempt to monopolize, apparent from the provisions of the written contracts themselves. No such per se violation is apparent in the present case, for neither the letter-contracts between Sherwood-Sinclair and Goodyear nor the agreements between Sherwood and its dealers contain any similar provisions. Any possible intent to monopolize or to unreasonably restrain trade in this case must be gleaned from the way in which the agreements were used."

And later:

"Since there was no per se violation of the antitrust laws, plaintiff had to prove facts which show public injury from the alleged attempt to monopolize. * * * The keen competition between suppliers for the service station business prevents control of wholesale prices by the Sinclair-Goodyear arrangement. There is no evidence in this case of any horizontal price fixing agreements between any of the tire companies or any of the oil companies with respect to TBA. Nor is there any suggestion of 'price leadership' in the TBA business in Maryland. The public has a choice of brands at Sinclair stations, and is free to buy any of the competing brands at service stations operated by other companies and at all sorts of other retail outlets. The Goodyear TBA products complete with those of other manufacturers and distributors on the basis of price, quality and all other relevant factors. Plaintiff has failed to prove any injury to the public from the Sinclair-Goodyear marketing arrangement."

stantial quantities of Goodyear TBA. This is further evidence of the illegal course of conduct by Sinclair toward its dealers.

■■ Nor do we think a tie-in escapes condemnation as an unreasonable per se restraint of trade because the buyer is not obligated to obtain all his requirements of the tied product from the seller. Although none of the cases brought to our attention has discussed this specific question in a similar factual context, to insist upon such exclusivity in a tie-in would be inconsistent with the trend of the decisions in this area. If a substantial amount of commerce is restricted by such arrangements, the standard for illegality would seem to have been met. Tying arrangements are:

> " * * * unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the tied product and a 'not insubstantial' amount of interstate commerce is affected." Northern Pac. R. Co. v. United States, supra, 356 U.S. at page 6, 78 S.Ct. at page 518.

The economic effect of the tying arrangement, not the degree of exclusivity, is the pertinent issue. The facts as found by the District Court make it clear that the power of Sinclair to appreciably restrain competition in TBA stemmed from Sinclair's position as supplier of more than 10% of the gasoline sold in the state of Maryland, and as gasoline supplier to more than 10% of the stations in the state, including the station leased to Osborn. The finding was that a not insubstantial amount of commerce is affected.

In International Salt, supra, involving contracts requiring lessees of the defendant's machines to use in them only salt purchased from the defendant, the argument was made that the agreements were lawful because the lessee was permitted to purchase a competitor's salt if obtainable at a lower price. While observing that this provision did "afford a measure of protection to the lessee," 332 U.S. at pages 396–397, 68 S.Ct. at page 15, the Court went on: "but it does not avoid the stifling effect of the agreement on competition." Likewise, in Northern Pacific, 356 U.S. at pages 11–12, 78 S.Ct. at page 521, it was argued that the tie-in agreements "are subject to so many exceptions and have been administered so leniently that they do not significantly restrain competition." This contention did not avail the defendant, as the Court replied that the tying arrangements did "deny defendant's competitors access to the fenced-off market on the same terms as the defendant." Also supporting the view that to be unlawful a tying arrangement need not completely cut off the buyer's access to competing products, are the cases concerning tie-ins of a seller's product to a particular machine supplied by the seller, even where the buyer was not forbidden to use competing products in like machines obtained elsewhere. See: Signode Steel Strapping Co. v. Federal Trade Commission, 4 Cir., 1942, 132 F.2d 48; Judson L. Thomson Mfg. Co. v. Federal Trade Comm., 1 Cir., 1945, 150 F.2d 952, certiorari denied 326 U.S. 776, 66 S.Ct. 267, 90 L.Ed. 469.

■ A tying agreement is defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed." Northern Pac. R. Co. v. United States, supra, 356 U.S. at page 5, 78 S.Ct. at page 518. In other words, the law has been violated if the defendant compels his customers to purchase a quantity of one product when they seek to buy another, the desired product. It is the restrictive nature of the agreement, not the fact of exclusivity, which is objectionable.

■■ Turning to the instant case, buying substantial quantities of Good-

year TBA clearly appears to have been a condition of the plaintiff's leasing the service station and being a dealer in Sinclair gasoline. The Goodyear TBA was tied to the lease and the sale of the gasoline. It matters not that the plaintiff was not forced to purchase his entire requirements in Goodyear merchandise. Certainly, insofar as he and other dealers were compelled to carry Goodyear, to that extent competition in TBA was curbed.

Sinclair argues that its conduct constituted merely a refusal to deal, sanctioned under the principle that a trader may select his customers as he sees fit. With this general principle, we have no quarrel. Even where a manufacturer or supplier has a policy aimed at a result which, if accomplished through an agreement or combination would amount to an unreasonable per se restraint of trade, he nevertheless may, in the absence of such agreement or combination, refuse to deal with a purchaser in accordance with the announced policy. United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. In the latter situation, however, the manufacturer's right of refusal has been severely limited. If he goes beyond the mere announcement of policy and refusal to deal with those not adhering to it, his course of conduct may constitute a forbidden agreement, combination, or arrangement to effectuate such policy. As the Court in Parke, Davis recently pointed out:

"* * * an unlawful combination is not just such as arises from a price maintenance agreement, express or implied; such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy." 362 U.S. at page 43, 80 S.Ct. at page 511.

And later:

"So long as Colgate is not overruled, this result [the economic effect of the manufacturer's policy] is tolerated but only when it is the consequence of a mere refusal to sell in the exercise of the manufacturer's right 'freely to exercise his own independent discretion as to the parties with whom he will deal.' [250 U.S. 300, 39 S.Ct. 468.] When the manufacturer's actions, as here, go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices, this countervailing consideration is not present and therefore he has put together a combination in violation of the Sherman Act. Thus, whether an unlawful combination or conspiracy is proved is to be judged by what the parties actually did rather than by the words they used. * * *" 362 U.S. at page 44, 80 S.Ct. at page 512.

In the present case, it is clear from the findings of fact that Sinclair-Sherwood's conduct went beyond a mere announcement of policy and refusal to deal. As pointed out above, the findings compel the conclusion that there existed, in fact, an express agreement with this particular plaintiff to buy Goodyear TBA, made after the cancellation of his first lease, in order for the plaintiff to be restored as a gasoline dealer. This case is not within the Colgate doctrine. Moreover, it is no distinction to say that Parke, Davis was concerned with price fixing whereas here we have a tie-in. Both price fixing and tie-ins affecting a not insubstantial amount of commerce, are illegal per se. By relying on Colgate, the defendant in fact admits that the same principles concerning refusals to deal are applicable to both tying arrangements and price fixing, for Colgate itself was a price fixing case.

The Supreme Court's observation in Standard Stations, 337 U.S. at page 305, 69 S.Ct. at page 1058, that "tying agreements serve hardly any purpose beyond the suppression of competition" applies with full force to the present case. The perniciousness of the imposed tie-in is aggravated by the fact that the defendant is not even in the business of selling

the tied products, but is employing its economic power in the gasoline industry to force his dealers to do business with a supplier in another industry under an arrangement that yields the defendant an extraneous revenue. The defendant in this case goes a step further than the supplier in the usual tie-in case, for here the tied product is not even handled or sold by the defendant, but it farms out to another, for a price, its coercive economic power.

We need not discuss the defendant's various arguments focusing upon the absence of proof of monopoly in the defendant or that the contracts between Sinclair-Sherwood and Goodyear were not, according to the "rule of reason," violative of the Sherman Act. These arguments are beside the point. We have here a tying arrangement between Sinclair and its dealers, found to affect a substantial part of commerce, solely for the defendant's economic benefit and not justified by the nature of the products. This is unreasonable per se, Northern Pac. R. Co. v. United States, supra. If, as the Supreme Court has said, "the vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another, regardless of the source from which the power is derived and whether the power takes the form of a monopoly or not," [3] the vice is well illustrated by this case.

While we conclude that an illegal arrangement or condition existed between Sinclair-Sherwood and its dealers and that Osborn's failure to abide by this arrangement or condition contributed to the cancellation of his lease, there are questions concerning Osborn's recoverable damages. On this point the District Judge said:

"Plaintiff suffered damage as a result of the cancellation but it was agreed at a pretrial conference that no proof of the amount of such damage should be offered until after it has been determined whether there was any violation of the antitrust laws. Plaintiff did not prove that he suffered any other damage as a result of the alleged violations."

Since Sinclair-Sherwood had the right to cancel the lease at its yearly termination date, the problem arises whether the damages flowing from the cancellation are recoverable as damages resulting from the violation of the anti-trust laws. See, however, Emich Motors Corp. v. General Motors Corp., 1951, 340 U.S. 558, 71 S.Ct. 408, 95 L.Ed. 534. Moreover, there is evidence in the record that Osborn had to pay more for Goodyear TBA products than for other brands which he desired.

Of course, if Osborn sustained no damages that are properly recoverable, he has no cause of action. Because of the questions inherent in this phase of the case, we think it appropriate to remand it to the District Court for further hearing, in which the parties will have full opportunity to present additional evidence on the question of damages in the period before as well as after the termination of the lease. The District Court should then determine what items, if any, are recoverable. We wish to emphasize that we are not at this time expressing or intimating any opinion on this aspect of the case.

Reversed and remanded.

## On Petition for Rehearing

Sinclair's petition for rehearing complained, preliminarily, that the grounds upon which this case was decided by us were not presented to or considered by the District Court and not raised, briefed and argued in this court. We find no merit in this complaint, but we set the motion for argument and the case has again been fully and vigorously argued on the merits. The contentions made are sufficiently dealt with in the above opinion, and we deem further elaboration unnecessary, except to answer Sinclair's insistence that as the record stands there is no evidence of its suffi-

3. Northern Pac. R. Co. v. United States, supra, 356 U.S. at page 11, 78 S.Ct. at page 521.

cient economic power to appreciably restrain commerce in TBA.

 Specific findings, properly supported, were made as to Sinclair's economic power in Maryland. Over 10% of the gasoline stations in the state were Sinclair's and more than 10% of the gasoline was sold by it. There is also ample evidence of the effectiveness of this power to restrain commerce in the tied product, TBA, to a not insubstantial degree. The propriety of the Judge's finding to this effect as to the dealers generally is not contested. In Northern Pacific R. Co. v. United States, 356 U.S. at pages 6 and 7, 78 S.Ct. at page 519, it was stated:

"Of course where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most. As a simple example, if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself."

The standard in Northern Pacific is a quantitative one. Just so the seller is of sufficient size to exert some power and the amount of commerce restrained is not insignificant, the standard is met. If all of the industry-wide economic data had to be shown for which Sinclair argues, it would convert tie-in cases to "rule of reason" cases with the requirement of public injury. When facts, as here, reveal a per se restraint of trade, it is not necessary for the plaintiff to prove, by voluminous economic data, that the public generally has been injured. Klors v. Broadway-Hale Stores, 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741. What the Court in Northern Pacific sought to point out is demonstrated by the illustration given: it is simply that a de minimis restraint on competition would not constitute an unlawful tie-in. There must be some not insubstantial

restraint. However, to make this modest showing it is not necessary to make out a "rule of reason" case. See also, for a discussion of the quantitative substantiality test, the Standard Stations case, 337 U.S. 293, 69 S.Ct. 1051.

We reaffirm our previous holding that the record in this case discloses an unlawful restraint of trade between Sinclair and its dealers generally in Maryland. This restraint consisted of tying the sale of TBA to the lease of service stations and the sale of gasoline. If the plaintiff suffered injury as a result of this illegality, he is entitled to recovery.

Petition for rehearing denied.